**CHICAGO COPPER AND CHEMICAL COMPANY, a corporation, Appellant,**

v.

**APEX MINING COMPANY, Inc., a corporation, and Raymond L. Govero, Appellees.**

No. 16392.

United States Court of Appeals Eighth Circuit.

Aug. 11, 1960.

William C. Wines, Chicago, Ill. (Alphonso H. Voorhees and Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., on the brief), for appellant.

Samuel Richeson, Hillsboro, Mo. (Dearing, Richeson & Weier, Hillsboro, Mo., on the brief), for appellees.

Before SANBORN, MATTHES and BLACKMUN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment for the defendants (appellees), Apex Mining Company, Inc., and Raymond L. Govero, citizens of Missouri, in an action brought by Chicago Copper and Chemical Company, an Illinois corporation, on May 29, 1958, to recover damages for breach of contract. The claim stated in the complaint is that, on or about December 8, 1956, the defendants entered into a written contract with the plaintiff, in which it agreed to buy from the defendants, and defendants agreed to sell and deliver to the plaintiff a minimum of 13,-000 tons and a maximum of 17,000 tons of crude barytes ore during the period December 10, 1956, to December 9, 1957, the ore to contain no more than 3% of ferric oxide and no less than 91% of barium sulfate, and the price per ton of such ore containing 94% of barium sulfate to be $15.50, with a premium of 7¢ for each 1/10 of 1% above 94% of barium sulfate content, and a corresponding penalty if the content was below 94%; that the plaintiff was at all times ready, willing and able to accept and pay for the barytes ore it had contracted to purchase from the defendants; that the defendants wholly failed and refused to sell or deliver any ore of the quality contracted for; that as a result of the de-

fendants' breach of the contract the plaintiff was compelled to purchase from other sources less desirable substitute ore at a higher cost, and was put to other special expenses, all to its damage in the sum of $111,231.00.

The Apex Mining Company in its answer denied the material allegations of the complaint, but stated that if the plaintiff by written agreement had acquired a right to require Apex to deliver ore to it, the plaintiff forfeited its right by failing to pay for barytes ore delivered to it by Apex, and that the ores agreed to be sold by Apex to the plaintiff were sold in accordance with a previously furnished sample, and that all ores delivered by Apex to the plaintiff conformed to such sample.

For a counterclaim, Apex stated that between November 1 and December 25, 1956, it delivered to the plaintiff, at its request, 573,600 pounds of barytes ore at the agreed price, and of the reasonable value, of $15.50 per ton, but that the plaintiff had failed to pay for the ore. Apex asked for judgment against the plaintiff for $4,445.00.

The defendant Govero in his answer denied virtually everything in the complaint, and stated: "That if plaintiff is entitled unto any contract with this defendant for the purchase of any ores of any kind or quality, that plaintiff breached its contract and forfeited the rights thereunder by failing to pay for ores delivered to plaintiff after payment therefor had become due and demand had been made therefor."

In its reply to the counterclaim of Apex, the plaintiff admitted that the defendants shipped 573,600 pounds of barytes ore, but denied that it was shipped at plaintiff's request, denied that it was of the grade specified in the contract, denied that it was worth $15.50 per ton, denied that it was suitable for plaintiff's use, and denied that plaintiff was obligated to pay for the ore. The plaintiff, in its reply to the counterclaim asserted that the ore referred to therein was unloaded at plaintiff's plant as a service to the defendants and was held in storage pending an agreement as to its disposition.

The issues made by the pleadings, at the time of trial, appear to have been: 1. Was there any such written contract between the parties as was alleged in the complaint? 2. If there was such a contract, had the defendants, by failing to sell and deliver to plaintiff the ore contracted for, breached the contract? 3. Had the plaintiff been ready, able and willing to pay for such ore if and when delivered? 4. Had the plaintiff, by failing to pay for seven carloads of ore shipped to it by the defendants, forfeited its right to recover damages?

The issues were tried to the court without a jury. The trial resulted in a judgment dismissing the plaintiff's complaint and allowing the counterclaim of Apex in the sum of $3,522.35.

The facts were largely undisputed, and need not be stated in complete detail. It was conclusively proved at the trial that the parties entered into the written agreement alleged in the complaint; it was conclusively proved that the defendants did not perform, and that they shipped no ore of the quality they had agreed to sell and deliver. Concededly, they did ship seven carloads of ore, apparently at the plaintiff's request but not pursuant to the contract in suit and not of the quality called for by the contract, such ore being low in barium sulfate and high in ferric oxide. Most of this ore was shipped before the formal written contract was signed, and none of it was accepted by the plaintiff as in compliance with the contract. The ore was later used by it in the manufacture of barium carbonate—apparently as an accommodation to the defendants. The undisputed evidence of the plaintiff showed the sources and the prices of all the crude barytes ore which the plaintiff purchased during the year 1957 to supply its needs.

As to the virtually undisputed evidentiary facts out of which this litigation arose, the record shows: That on November 16, 1956, J. B. McKoane, the plaintiff's sales manager, called on Raymond Govero, of the Apex Mining Com-

pany, about buying ore from the mine it was then operating in Washington County, Missouri, ore fields; that McKoane took a sample of ore from the "drag chain" while in operation, and took the ore sample to Chicago for analysis; that the sample was evidently deemed typical of the crude ore the defendants were producing; that an analysis of the sample by the plaintiff showed 94.59% of barium sulfate and 1.82% of ferric oxide; that on November 23, 1956, in the morning, the plaintiff sent the following telegram:

"Apex Mining Company,
"Mineral Point, Missouri.
"Attention: Mr. Raymond Govero
"We offer for your entire productive output washed and jigged barytes minimum 13000 tons maximum 17000 tons December 10, 1956 to December 9, 1957, $15.50 per ton F. O. B. box cars Mineral Point, Missouri, or adjacent shipping point dry basis for 94% $BaSO_4$—premium or penalty seven cents per ton per each one tenth percent $BaSO_4$ over or under 94% $BaSO_4$ maximum allowable $Fe_2O_3$—3%—mimimum allowable $BaSO_4$ 91%—cars to be loaded according to RR Tariffs to obtain minimum freight rate. RR weights to govern. Offer good only for telegraphic acceptance by you within one hour receipt this telegram by you or receipt your reply by noon, Central Standard Time, by us at Blue Island today whichever later. Also offer as alternative for one half of above quantities for six months beginning December 10, 1956. Other conditions same.
"Chicago Copper & Chemical Co.,
"Blue Island, Illinois";

and that on the same day, in the afternoon, the defendants sent the following wire to the plaintiff:

"Western Union Telegram
"1956, Nov. 23, P.M. 12:26.
"Bonne Terre, Mo.
"Chicago Copper and Chemical Co.,
"Att'n J. B. McKoane Blue Island, Ill.
"Ready to sign contract per your telegram.
"Apex Mining Co.,
"Raymond Govero".

The record further shows that on November 24, 1956, McKoane presented to Govero a proposed two-page contract, in duplicate, for signature; that Govero signed it and initialed each paragraph; that the signatures were written in longhand on the bottom of each page, as follows:

"Apex Mining Co.
"Raymond Govero",

and that below the signatures appeared in typewriting:

"Apex Mining Company and/or Raymond Govero".

The record indicates that, after the contract had been executed in duplicate by Govero for himself and his company, it was returned to the plaintiff; that it was executed by the plaintiff on December 8, 1956, and the duplicate copy mailed on that date to Govero, who testified that he did not receive it until December 13 or 14. On December 3, 1956, he had written the President of the plaintiff that he was expecting his copy of the agreement, duly executed.

So much of the contract as we regard as pertinent on this appeal reads as follows:

"Contract
"Buyer—Chicago Copper & Chemical Company, Blue Island, Illinois
"Seller—Apex Mining Company and/or Raymond Govero, Festus, Missouri
"Material—Crude Barytes Ore, Washed and Jigged
"Quality—Maximum allowable $Fe_2O_3$—3%, Minimum $BaSO_4$—91%
"Shipping Equipment—Railroad boxcars. Cars to be loaded in accordance with railroad tariffs; at least 90% of marked capacity of car, not less than 80,000 pounds. Failure to load in accordance with tariff

causes additional freight per ton shipped which is to be borne by seller.

"Period—December 10, 1956 to December 9, 1957.

"Quantity—Total minimum years —13,000, total maximum yearly— 17,000 tons

Total minimum quarterly—3,250, total maximum quarterly 4,250 tons

"Price—F.O.B. Mineral Point, Missouri or adjacent shipping point —$15.50 per ton of 2,000 lbs. dry basis for 94% $BaSO_4$ with premium or penalty of seven cents per each one tenth of 1% above or below 94%.

"Terms—Railroad weights to govern. Payments to be made on 90% of railroad weights at base price of $15.50 per ton weekly for cars received up to seven days during previous calendar week. Balance to be remitted within five weeks of receipt of cars to include adjustment for premium or penalty.

"Shipments—To be in approximately even weekly quantities except when severe winter weather makes this impractical or too costly for seller."

On December 11, 1956, the plaintiff wired the defendants as follows:

"Apex Mining Company,
"Raymond Govero,
"Mineral Point, Mo.

"(If not delivered by evening try: Raymond Govero, Festus or Crystal City, Mo.)

"Analysis of ore received from your car DL&W 46555 $Fe_2O_3$ three point seven percent and car MP 94404 $Fe_2O_3$ four percent. Do not make further shipments until you can assure yourself and us that they will be within specifications. We believe we can show you how to upgrade at least part of your production. Meanwhile we have unloaded DL&W 46555 to segregated storage but unloading of this shipment does not constitute a waiver of tolerance provisions of contract as to other shipments. Holding MP 94404 and PRR 29489 loaded on track for your check analysis if you wish one and ask you advise disposition. We were not aware that you intended shipping more than the two cars before this week. Tried to reach you all last evening by phone.

"Chicago Copper & Chemical Co."

While nothing, so far as is shown by the record, was said during the course of the actual trial about the plaintiff having repudiated the contract, the trial court based its conclusion that the contract had been repudiated by the plaintiff upon one paragraph of a letter written by the President of the plaintiff under date of December 14, 1956, after having had a telephone conversation on December 13 with Govero with respect to the shipments of substandard ore.

The entire letter reads as follows:

"December 14, 1956.
"Apex Mining Company,
"Mineral Point,
"Missouri.
"Attention: Mr. Raymond Govero.
"Dear Mr. Govero:

"In accordance with telephone conversation of yesterday we will unload the six cars of Barytes Ore which you have shipped us. Insofar as any or all of these are not within the specifications set down in our telegrams of November 23 and 24th and our signed contract (copy of which was mailed you from Chicago on December 8th by our Mr. Coolidge) the unloading and storage will be for your account and risk. You understand that we do not want ore of the quality which is not within specifications and are unloading such cars only as an accommodation to you.

"We have completed the iron analysis on PRR 29489 and find that the $Fe_2O_3$ content is 3.6 percent, DL&W —3.79 percent and MP 94404—4.03 percent.

"It is understood that you are to ship no more, until you have piled several cars of ore which you believe to be within specifications at your railroad siding and submitted representative samples to us for approval, and received our consent to ship. We request that you follow this procedure, until we are satisfied that you are able to estimate the quality yourself or have some means of analyzing before shipment in order to be sure that no further shipment not within specifications will be made.

"It was our understanding from our Mr. McKoane that you were shipping two trial cars originally the week of November 19th but that you were unable to obtain the cars and that these were actually coming forward the week of November 26th. Beyond these two cars we did not expect any shipments until the contract was in effect on December 10th and consequently, we have been seriously inconvenienced by the arrival of the extra cars.

"This is particularly true in that you sent us no bills of lading or gave us any other notice that the cars were enroute. In the future please see that bills of lading are sent us at once upon release of the cars to the railroad.

"We have not received freight bills on two of the cars which you have shipped. Car DL&W 46555 shows weight of only 70,100 pounds. The railroad bills us as if the car contained 90,000 pounds and therefore among other adjustments it will be necessary for you to absorb the freight on the difference between the actual weight and the minimum weight allowable by the railroads to obtain the applicable per ton freight rate.

"For your information and protection we will state that it is possible for you to obtain weights on shipments direct from the Mo.-Pac. at St. Louis should you care to do so. If cars are found not to contain the required minimum, arrangements can undoubtedly be made to have them returned for further loading. Also, should you suspect that the weights are incorrect you can telephone us and we will be happy to request a re-weigh by the CRI&P at this end. We have no way of verifying weights ourselves and must rely solely on railroad weights.

"We also wish again to state that both by analysis and visual observation the three cars which have arrived from you so far have not been of the same quality as the sample which our Mr. McKoane brought back, and which he quoted you as having said—you believed contained as high an iron content as you have been turning out. The sample which he brought back was cleaner looking, had considerably more white basis of Barytes and very much less iron attached to the Barytes, and very much less material which does not look like Barium Sulfate at all.

"We made the offer which we did and signed the contract which we did under the impression that at the very worst the sample which Mr. McKoane brought back would be representative of what you could ship.

"We trust that you can correct the matter in some way.

"Yours very truly,

"Chicago Copper & Chemical Co.

\* \* \* \* \* \*

"WKC/hk

"P.S. \* \* \*"

The paragraph of the letter which the defendants contend shows a repudiation of the contract by the plaintiff is the third, reading as follows:

"It is understood that you are to ship no more, until you have piled several cars of ore which you believe to be within specifications at your railroad siding and submitted representative samples to us for approval and received our consent to ship. We request that you follow this procedure, until we are satisfied that

you are able to estimate the quality yourself or have some means of analyzing before shipment in order to be sure that no further shipment not within specifications will be made."

There was evidence by Govero that if he had complied with the request that he stockpile several carloads of ore and then take a sample, send it to the plaintiff for analysis, and wait for permission to ship, the ore would have cost three to four dollars a ton more.

It seems clear to us that the plaintiff, instead of intending or attempting by the letter of December 14, 1956, to repudiate the contract, was trying to secure performance of it according to its terms, and to have Govero bring the quality of his ore up to the standard required by the contract. The record shows that the plaintiff in 1957 had use for all the barytes ore of a grade suitable for its operations which it could locate, and during that period wanted the ore for which it had contracted with the defendants, and that it was ready, willing and able to carry out its part of the bargain with them. It seems scarcely conceivable that the plaintiff, who was in the market for ore of suitable quality, would on December 8 contract for a supply of such ore at an advantageous price and then on December 14 repudiate its agreement. The letter of December 14 was, in our opinion, too weak a peg upon which to hang a repudiation of the contract. Nor do we think that the Missouri cases cited by the defendants and the trial court support a conclusion that the contract was repudiated. The cases are distinguishable.

The case of Lonsdale Grain Co. v. Canton Milling Co., 195 Mo.App. 452, 193 S.W. 853, had to do with a contract to buy and sell wheat to be delivered in August of 1914. On August 3, 1914, the buyer wired the seller asking that shipments be stopped, saying that, if shipments were made, drafts covering such shipments would not be paid. Speaking of this telegram, the Kansas City Court of Appeals said (at page 854 of 193 S.W.): "It is a flat direction to stop further shipments of the wheat, and is an announcement that, if any more shipments are made, drafts for payment will be refused." The court held that this was a repudiation of the contract on the buyer's part and that the only other question was, "Did defendant [the seller] accept and treat it as a renunciation or cancellation?" Under the evidence in that case, this was held to be a question for the jury to decide.

The question involved in Rexite Casting Co. v. Midwest Mower Corp., Mo. App., 267 S.W.2d 327, was whether a seller, who had agreed to manufacture and deliver aluminum castings and, in addition, permanent molds for making such castings, could recover a balance due for molds after having breached its agreement by refusing to deliver castings at the contract price. It was held that refusal to further perform the partly executed contract unless the buyer agreed to pay a substantial increase in price for castings was a total breach of the entire contract, and that the seller could not recover the balance due for molds.

Spitcaufsky v. Guignon, Mo., 321 S.W. 2d 481, 487–488. Stated briefly, this case dealt with a broker's contract for a commission. The landowner, who had agreed to pay the commission if the broker accomplished certain things, added other requirements after the broker had performed his commitments, thus allegedly depriving him of his earned commission. It was held that the landowner was liable for the commission.

In each of the cases relied on by the trial court, the intention of the repudiating party was clear and unequivocal. See, also, Crown Products Co. v. California Food Products Corp., 77 Cal.App. 2d 543, 175 P.2d 861, 865.

There was, we think, no adequate evidentiary basis for a ruling that the statement of the President of the plaintiff in the letter of December 14, 1956, as to his understanding of what was to be done to avoid the shipment of carloads of ore below contract grade which the plaintiff did not want and could not use,

constituted a positive refusal to accept or to pay for ore which did measure up to the contract requirements.

Moreover, it seems obvious to us that neither the plaintiff nor the defendants treated the contract as having been repudiated by the letter of December 14. On January 3, 1957, the President of the plaintiff wrote Govero as follows:

"Apex Mining Company,
"Box 318,
"Mineral Point, Missouri.
"Attention: Mr. Raymond Govero,
      "President.
"Dear Mr. Govero:

"As it has now been about three weeks since we have heard from you in connection with ore shipments under our contract, we ask that you advise us at your early convenience as to what progress you are making toward shipping us material in accordance with the specifications called for.
          "Yours very truly,
               "President.
"W. K. Coolidge/bw";

and on January 10, 1957, sent him the following wire:

"Apex Mining Company,
"Mineral Point, Missouri.
"Attention: Mr. Raymond Govero.

"Please reply our letter January third requesting information your plans shipment Barytes under our contract.
          "W. K. Coolidge,
          "Chicago Copper &
           Chemical Company";

and again wired him on January 14, 1957, as follows:

"Apex Mining Company
"Mineral Point, Missouri.
"Attention: Mr. Raymond Govero

"Have had no reply our letter January 3rd or our wire January 10th requesting your plans shipment barytes under our contract.
          "W. K. Coolidge
          "Chicago Copper &
           Chemical Co."

A reply by letter was finally elicited from Govero on January 15, 1957, reading as follows:

"Apex Mining Company
      "Incorporated
      "Box 318
"Mineral Point, Missouri
               "January 15, 1957.
"Mr. W. K. Coolidge
"Chicago Copper & Chemical Co.
"Blue Island, Illinois.
"Dear Sir:

"We are not able at this time to make shipment of ore in accordance with the specifications set forth in the contract. It was our understanding that you did not wish any further shipments made.

"Also, we have had no advice from you concerning payment for the seven cars of ore shipped during December. According to the contract, the amount due for these seven cars is $3,903.38. Since three of the cars weighed less than 70,000 pounds, we understand the freight rate increases and agree to pay this increase.

"This is to advise that no further shipments of ore will be made until we are certain that the ore shipped will meet all specifications and your remittance is received for the amount due.
          "Yours very truly,
          "Apex Mining Company, Inc.
          "(Signed) Raymond Govero
          "Raymond Govero, President
"RG/ak".

To this, on January 18 the plaintiff responded by letter, which, among other things, contained these statements:

"We have now been waiting since January 3rd for an answer to our request for information as to progress you were making toward shipping us Barytes in accordance with specifications in our contract. You have failed to enlighten us on this most important point. It seems to us that the least you can do is to keep us in-

formed as to what progress you are making in fulfilling the contract, what your plans are and to answer our letters and telegrams.

"We now wish to have shipment under the contract and again, we wish to have advice by letter as to your plans for keeping these shipments in accordance with specifications under the contract. We shall be glad to discuss the possibility of taking off of your hands the cars which have been unloaded for your account and risk but feel that we are entitled to be fully informed as to what you have done so far and your plans for keeping us properly supplied under our contract.

"We have now permitted a lapse of over 5 weeks on shipments purely as an accommodation to you and any further delay is not with our consent.

> "Yours very truly,
> "President

"W. K. Coolidge/by

"P.S. We can no longer accede to delayed shipments. We must again state that any acquiescence upon our part in any instance of deviation from any terms of the contract, whether as to weights, quality, time of shipment or other provisions of our agreement, does not signify a waiver of any part of the contract as to future shipments.

> "W. K. Coolidge"

On January 25, 1957, the following letter was sent by Govero to the President of the plaintiff:

> "Apex Mining Company
> "Incorporated
> "Box 318
> "Mineral Point, Missouri
> > "January 25, 1957.

"Mr. W. K. Coolidge, President

"Chicago Copper &
  Chemical Company

"Blue Island, Illinois

"Dear Sir:

"Last week Mr. Jay McKoane, your sales manager, called at my office and I explained to him at that time that the Barytes we are now mining is not of the quality specified in the contract. I told him that I would have the ore tested and advise him on the results. The ore analyzed 2.10% $Fe_2O_3$ and 89.70 $BaSO_4$.

"I am doing my very best to improve the quality of the ore and will make further shipments as soon as I feel it is safe to do so.

> "Apex Mining Company, Inc.
> "(Signed) Raymond Govero
> "Raymond Govero, President

"RG/ak".

Whether the statements of the defendants indicating an intention to carry on under the contract be regarded as a recognition that the plaintiff's letter of December 14, 1956, was not intended by the plaintiff as a positive statement that it would not perform its contractual duties, or as a waiver by the defendants of any right they might claim to treat the contract as having been repudiated, is of no consequence.

■ It is our opinion that the determination by the trial court that the plaintiff had repudiated the contract on December 14, 1956, and that the defendants thereafter were under no obligation to sell and deliver the ore which they had contracted to sell and deliver, is contrary to the weight of the evidence and is clearly erroneous.

The trial court decided only two issues: (1) whether the defendants were liable for breach of the contract, and (2) what, if anything, was owing to the defendant Apex Mining Company, Inc., on its counterclaim. The judgment on the counterclaim has not been challenged on this appeal.

■ The plaintiff asks this Court to reverse the judgment dismissing its complaint. It also asks for the entry of a judgment in its favor against the defendants for $101,529.97. The question of the amount of damages is an undetermined issue of fact for the trial court. That is also true of the question whether

Govero is properly a defendant who can be held liable. See Rosen v. Westinghouse Electric Supply Co., 8 Cir., 261 F.2d 514, 515. See, also: Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417, 150 A.L.R. 1056; Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 137–138; United States v. First Sec. Bank of Utah, N.A., 10 Cir., 208 F.2d 424, 429, 42 A.L.R.2d 951.

It is our conclusion that the plaintiff is entitled to a reversal of the judgment dismissing its complaint and to a remand of the case for further proceedings not inconsistent with this opinion.

It is so ordered.