306 F.2d 725
 APEX MINING COMPANY, Inc., a corporation, Appellant,
v.
CHICAGO COPPER AND CHEMICAL COMPANY, a corporation, Appellee.
CHICAGO COPPER AND CHEMICAL COMPANY, a corporation, Appellant,
v.
APEX MINING COMPANY, Inc., a corporation, and Raymond L. Govero, Appellees.
 No. 16940.
 No. 16941.
 United States Court of Appeals Eighth Circuit.
 August 17, 1962.
 
 COPYRIGHT MATERIAL OMITTED William C. Wines, Chicago, Ill., made argument for Chicago Copper and Chemical Co., and Alphonso H. Voorhees, Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., were with him on the brief.
 Samuel Richeson of Dearing, Richeson & Weier, Hillsboro, Mo., made argument for Apex Mining Company and Raymond L. Govero and filed brief.
 Before SANBORN, BLACKMUN and RIDGE, Circuit Judges.
 SANBORN, Circuit Judge.
 
 
 1
 This diversity action was brought by the Chicago Copper and Chemical Company, of Illinois, against Apex Mining Company, Inc., and Raymond L. Govero, of Missouri, on May 29, 1958, to recover damages for the breach of a written contract to sell and deliver crude barytes ore of a specified quality and in specified quantities during the period December 10, 1956, to December 9, 1957. The case was tried to the District Court without a jury on February 26 and 27, 1959. The issues were (1) liability and (2) damages. Govero, president of Apex, denied that he personally was a party to the contract. Both defendants denied liability. The District Court determined that the plaintiff had repudiated the contract, and entered a judgment of dismissal of its action on October 9, 1959. The judgment also allowed a counterclaim of Apex for the price of some substandard ore delivered by it to the plaintiff. The counterclaim is no longer an issue. The plaintiff appealed from the judgment. This Court, on August 11, 1960, (281 F.2d 530), reversed, and remanded the case for the determination of the amount of damages to which the plaintiff was entitled and the question of the liability of Govero as a defendant, issues of fact which the District Court had not reached or decided.
 
 
 2
 A hearing, on remand of the case, was held by the District Court on February 24, 1961, upon the record of the trial had in February 1959. The plaintiff offered two depositions adding to the evidence as to efforts it had made in 1957 to procure usable ore in substitution for that which the defendants had failed to deliver. The defendants objected to any amplification of the record made at the trial, on the ground that this Court had not directed a retrial of the undetermined issues. The trial court, in effect, received the depositions subject to the objection. It eventually ruled that "[t]he proof on the remaining issues had been fully developed and no further evidence is necessary for adjudication of those issues."
 
 
 3
 Based upon the trial record without amplification, the trial court, on June 29, 1961, determined: (1) that Govero individually was not bound by the contract in suit and was not liable for its breach; and (2) that the plaintiff was entitled to $12,009.85 as damages against Apex alone. Judgment was entered accordingly on November 1, 1961.
 
 
 4
 The plaintiff has appealed. It contends that the findings upon which the judgment is based are clearly erroneous; that, under the evidence and applicable law, which is that of Missouri, Apex and Govero were jointly and severally liable; and that the actual damages sustained by the plaintiff as the result of the failure of Apex "and/or" Govero to deliver the ore they were obligated to deliver, was $101,510.03, as shown by the evidence.
 
 
 5
 Apex has also appealed, claiming that, under the evidence, the award of $12,009.85 to the plaintiff is excessive, and that, because the plaintiff had failed to minimize its damages, no damages should have been allowed.
 
 
 6
 The circumstances which gave rise to this litigation are adequately stated in the former opinion of this Court. 281 F.2d 530. The contract in suit, which was drafted by the plaintiff, so far as pertinent reads as follows:
 
 
 7
 "CONTRACT
 
 
 8
 "BUYER — Chicago Copper & Chemical Company, Blue Island, Illinois
 
 
 9
 "SELLER — Apex Mining Company and/or Raymond Govero, Festus, Missouri
 
 
 10
 "MATERIAL — Crude Barytes Ore, Washed and Jigged
 
 
 11
 "QUALITY — Maximum allowable Fe2O3-3%, Minimum BaSO4 — 91%
 
 
 12
 "SHIPPING EQUIPMENT — Railroad Boxcars. Cars to be loaded in accordance with railroad tariffs; at least 90% of marked capacity of car, not less than 80,000 pounds. Failure to load in accordance with tariff causes additional freight per ton shipped which is to be borne by seller.
 
 
 13
 "PERIOD — December 10, 1956 to December 9, 1957.
 
 
 14
 "QUANTITY — Total minimum years — 13,000, total maximum yearly — 17,000 tons
 
 
 15
 Total minimum quarterly — 3,250, total maximum quarterly 4,250 tons
 
 
 16
 "PRICE — F.O.B. Mineral Point, Missouri or adjacent shipping point — $15.50 per ton of 2,000 lbs. dry basis for 94% BaSO4 with premium or penalty of seven cents per each one tenth of 1% above or below 94%.
 
 
 17
 "TERMS — Railroad weights to govern. Payments to be made on 90% of railroad weights at base price of $15.50 per ton weekly for cars received up to seven days during previous calendar week. Balance to be remitted within five weeks of receipt of cars to include adjustment for premium or penalty.
 
 
 18
 "SHIPMENTS — To be in approximately even weekly quantities except when severe winter weather makes this impractical or too costly for seller.
 
 
 19
 * * * * * *
 
 
 20
 "SAMPLING AND ANALYSIS — To be made by buyer, but seller to have privilege of sampling and analysis at any time.
 
 
 21
 * * * * * *
 
 
 22
 "CARRY OVER CLAUSE — If buyer elects during any quarter to take less than the maximum called for in the contract for that quarter, the difference between what buyer elects to take and the maximum called for may be taken by buyer in the ensuing quarter in addition to amounts called for by the contract in that quarter. This carry over is not, however, permissable for more than one quarter beyond the original quarter in which buyer elects not to take the maximum and carry over amounts shall not be confused with amounts called for each quarter by the contract."
 
 
 23
 The contract was signed by the defendants in handwriting:
 
 
 24
 "Apex Mining Co.
 "Raymond Govero".
 
 
 25
 Below the signatures appeared in type-writing:
 
 
 26
 "APEX MINING COMPANY AND/OR RAYMOND GOVERO".
 
 
 27
 The trial court concluded that Govero, as president of Apex, had executed the contract on its behalf and solely in a representative capacity, and that it was not the intent of the parties that he should be bound personally by the contract. The question, we think, was one of fact for the trial court. See and compare, Rosen v. Westinghouse Electric Supply Company, 8 Cir., 261 F.2d 514, 515, and Gilbert v. United States, 370 U.S. 650, 653, 82 S.Ct. 1399, 8 L.Ed.2d 750.
 
 
 28
 Moreover, the ambiguity created by the use of the words "and/or" should, we think, be resolved against the plaintiff, since it drew the contract. The conclusion reached by the District Court that Govero was not personally liable, we regard as a permissible one. No Missouri case demonstrates that the conclusion is based upon a clear misconception or misapplication of Missouri law. Cf. Homolla v. Gluck, 8 Cir., 248 F.2d 731, 733-734, and Village of Brooten v. Cudahy Packing Company, 8 Cir., 291 F.2d 284, 288-289.
 
 
 29
 The question of the amount of damages recoverable by the plaintiff because of the default of Apex is troublesome. If the ore called for by the contract had had an established market price, the amount of damages would have been the difference between that price and the contract price, based on the total tonnage the buyer was entitled to receive. Concededly, there was, at the time Apex failed to perform, no established market price for the ore it had agreed to deliver. Moreover the contract price varied with the content of the ore. Ore with less than 3% of iron oxide and as much as 100% barium sulphate would have been within the contract specifications. It was the barium sulphate content of the ore in which the plaintiff was interested. Apparently, the only reason for limiting the iron oxide content was that if it was too high the ore would cake in the rotary kiln used in the operation of converting barium sulphate to barium carbonate, the desired end product. What the plaintiff obviously wanted from Apex, and what Apex agreed to sell and deliver to the plaintiff, was washed and jigged barytes ore with 3% or less of iron oxide and 91% or more of barium sulphate.
 
 
 30
 What happened, after Apex failed to perform its contract, was that the plaintiff sought other sources of usable ore to supply its needs, for which it paid more than the contract price plus freight. Much of the substitute ore purchased did not meet the specifications of the contract, and much of it was lump ore. The substitute ore, in large part, came from various locations, some of which required higher freight rates.
 
 
 31
 The plaintiff computed the average price and grade of all the ore which it purchased, whether within the specifications of the contract or not, including lump ores. The computation shows that the average percentage of barium sulphate in all the ore purchased during the contract period was 91.71. The average price per ton, delivered at plaintiff's plant, for all this ore was $25.24. Under the contract, the price to be paid for ore containing 91.71% barium sulphate was $13.62 f.o.b. Mineral Point, Missouri. The freight rate from that point to plaintiff's plant was $6.36 per ton. Had Apex delivered the ore it contracted to deliver, the cost to the plaintiff would have been $5.26 per ton less than the plaintiff paid, on the average, for the substitute barytes ore which it purchased from other sources.
 
 
 32
 The plaintiff, during the year covered by the contract, actually purchased 12,009.85 tons of substitute ore, for which it paid, including freight, $63,171.81 over the price for ore specified in the contract with freight added. The plaintiff contended at the trial, and still contends, that, since by the terms of the contract, it had the right to demand and receive from Apex a maximum of 17,000 tons, its damages should be based upon that figure, and not upon the actual tonnage of ore it purchased to meet its needs after Apex defaulted. This contention apparently greatly shocked the sensibilities of the trial judge. It is, no doubt, true, as the plaintiff contends, that if the ore contracted for had had an established market price, the measure of damages would have been the difference between that price and the contract price (if lower) of the maximum tonnage of ore agreed to be delivered to the plaintiff. See Great Eastern Oil Co. v. DeMert & Dougherty, Inc., 350 Mo. 535, 545-546, 166 S.W.2d 490, 495, in which it was said: "If the buyer does purchase the goods elsewhere, the measure of damages will be the difference between the contract price and the purchase price, at least up to market value." While we perceive nothing illogical and certainly nothing offensive in the plaintiff's contention, we think that it cannot be said with complete assurance that the Supreme Court of Missouri, if confronted by the issue, would accept the plaintiff's view that the measure of damages should be based upon the maximum tonnage the plaintiff could have demanded from Apex.
 
 
 33
 One reasonably may believe that the proximate practical result of the default of Apex was to compel the plaintiff to purchase 12,009.85 tons of ore, to meet its needs, from other sources at higher than the contract prices, and that what the plaintiff reasonably had to pay for such ore in excess of what it would have paid if the contract had been performed would constitute its loss in that regard.
 
 
 34
 "The buyer may supply himself by purchases in the market, and where he does so, he may ordinarily recover the difference between the agreed price and the advance price which he is forced to pay, where he uses reasonable diligence and care in making the purchase." 46 Am.Jur., Sales § 681. This Court, in Gaunt v. Ralston Purina Co., 8 Cir., 198 F. 60, held, in effect, that the measure of damages for the breach by the seller, of a contract for the sale of corn, if it were found to have been unprocurable by the buyer on the market at the agreed time and place of delivery, would be the difference between the contract price and what it cost the buyer, in the exercise of reasonable diligence, to procure the corn contracted for.
 
 
 35
 Mr. Justice Holmes, in Globe Refining Company v. Landa Cotton Oil Company, 190 U.S. 540, 543-544, 23 S.Ct. 754, 47 L.Ed. 1171, said:
 
 
 36
 "* * * When a man makes a contract he incurs by force of the law a liability to damages, unless a certain promised event comes to pass. * * * If a contract is broken the measure of damages generally is the same, whatever the cause of the breach. We have to consider therefore what the plaintiff would have been entitled to recover in that case, and that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.
 
 
 37
 "* * * The consequences must be contemplated at the time of the making of the contract."
 
 
 38
 The late Judge Collet of this Court, while a Missouri federal district judge, in his opinion in Mills & Exports Co. v. Fleischman, D.C.E.D.Mo., 25 F.Supp. 732, 734, quoted with approval the following language from St. Louis Steel Range Co. v. Kline-Drummond Mercantile Co., 120 Mo.App. 438, 96 S.W. 1040, 1042:
 
 
 39
 "* * * The guiding principle of the law in cases arising on breaches of contracts for the sales of personal property is to give the aggrieved party the benefit of his contract by putting him in as favorable a condition as he would have enjoyed if the other party had performed, instead of violating, his agreement; in other words, to afford full indemnity for the breach. All other rules, including the one relating to the difference between the agreed and the market value of the thing sold, are but corollaries of this one, used to apply the principle of it to the different classes of cases which occur."
 
 
 40
 We think there was an inadequate evidentiary basis for the trial court's determination that damages of $1.00 per ton for the 12,009.85 tons of substitute ore the plaintiff purchased to supply its needs, during the contract period, represented full indemnity for the seller's breach of the contract in suit. It is true that evidence was introduced by Apex tending to show that there were sources in the ore-producing area in Missouri from which washed and jigged barytes ore of the quality specified in the contract might have been procured by the plaintiff, had it discovered them, at a lesser price than it paid for substitute ores purchased elsewhere, but not at $1.00 per ton in excess of the contract price.
 
 
 41
 In addition to the excess in price paid for substitute ores purchased to supply its needs during the contract period, the plaintiff claims that it is entitled to an award of damages of (1) $6,502.03, the difference between the cost of a jaw crusher (and auxiliary equipment), installed to enable the plaintiff to handle substitute hard lump ore, and the present worth of the crusher and equipment; (2) one-half the value of a loading machine, amounting to $2,588.00; and (3) $3,000 additional expense of handling substitute ore.
 
 
 42
 Whether these items of special damages can be allowed depends upon whether they reasonably and fairly may be found to have been within the contemplation of the parties to the contract as a result of its breach. Appliances, Inc. v. Queen Stove Works, Inc., 228 Minn. 55, 62, 36 N.W.2d 121, 125. That presents a question of fact for the determination of the trial court.
 
 
 43
 "In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury." Restatement of the Law, Contracts, § 330.
 
 
 44
 So far as the contention of Apex that the judgment should be reversed and no damages awarded the plaintiff because the evidence shows that the plaintiff enhanced rather than mitigated the damages attributable to the breach of the contract in suit, is concerned, we think the contention is without merit. We agree with what was said by the Court of Appeals for the Third Circuit in In re Kellett Aircraft Corp., 186 F.2d 197, 198-199, namely:
 
 
 45
 "* * * The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. One is not obligated to exalt the interests of the defaulter to his own probable detriment. * * *"
 
 
 46
 Apex had the burden of proving that the plaintiff did not use reasonable diligence in procuring substitute ore at a fair price.
 
 
 47
 The plaintiff asks that we direct the entry of judgment in its favor for $101,510.03 as its damages. Much as we should like to terminate this prolonged litigation, we do not retry doubtful issues of fact. "On review, this Court should refrain from exercising any of the trial functions conferred by law upon the district courts." Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 138.
 
 
 48
 Our conclusion is that the plaintiff is entitled to a retrial of the issue of damages upon the trial record plus such additional relevant evidence as either party sees fit to introduce with respect to that issue, including the questions (1) whether the plaintiff made reasonable efforts and used reasonable diligence in procuring at a fair price the substitute ore to meet its needs, and (2) whether the items of special damages claimed by the plaintiff were within the contemplation of the parties at the time the contract was entered into and were caused by its breach.
 
 
 49
 The judgment, in so far as it determined that Apex Mining Company, Inc., is the only defendant liable under the contract, is affirmed. In so far as the judgment determined the issue of damages, it is reversed with directions to grant a retrial of that issue upon the trial record as it may be amplified by the parties.
 
 
 50
 Affirmed in part. Reversed in part and remanded for a new trial on the issue of damages.