CHICAGO COPPER & CHEMICAL COM-
PANY, a corporation, Plaintiff,

v.

APEX MINING COMPANY, Inc., a cor-
poration, and Raymond L. Govero,
Defendants.

No. 58 C 243(1).

United States District Court
E. D. Missouri, E. D.

Feb. 7, 1964.

Alphonso Voorhees, Ely & Voorhees, St. Louis, Mo., for plaintiff.

Samuel Richeson, Dearing, Richeson, Weier & Roberts, Hillsboro, Mo., for defendants.

HARPER, Chief Judge.

This cause was originally tried to this court without a jury on February 26 and 27, 1959. Subsequently, this matter has been appealed twice to the Eighth Circuit Court of Appeals—second appeal came after this court entered a memorandum opinion on June 29, 1961—and is now before this court for a third hearing. The circumstances which gave rise to this litigation are adequately stated in 281 F.2d 530. The most recent opinion of the Eighth Circuit Court of Appeals can be found in 306 F.2d 725.

The Court of Appeals affirmed this court's judgment rendered on June 29, 1961, insofar as it determined that Apex Mining Company, Inc., is the only defendant liable under the contract. The same court, insofar as the judgment determined the issue of damages, reversed the same with directions to grant a retrial of that issue upon the trial record as it may be amplified by the parties. The Court of Appeals concluded that the plaintiff was entitled to a retrial on the issue of damages, including the determination of first, whether the plaintiff made reasonable efforts and used reasonable diligence in procuring at a fair price the substitute ore to meet its needs, and second, whether the items of special damages claimed by the plaintiff were within the contemplation of the parties at the time the contract was entered into and were caused by its breach.

At 306 F.2d 725, 731, the Court of Appeals held that the defendant Apex had the burden of proving that the plaintiff did not use reasonable diligence in procuring substitute ore at a fair price.

The Eighth Circuit at 306 F.2d 731, as I read their opinion, held that whether special damages can be allowed depends upon whether they reasonably and fairly may be found to have been within the contemplation of the parties to the contract as a result of its breach. The court further stated that this presented a question of fact for the determination of the trial court.

The plaintiff, during the year covered by the contract, purchased 12,009.85 tons of substitute ore, although it had the right to demand 17,000 tons under the terms of the contract. As I understand the Court of Appeals' decision, the plaintiff's damages should be based on the actual tonnage of ore purchased and not the maximum tonnage which plaintiff had the right to demand under the terms of the contract.

The plaintiff suggests as the measure of damages, since there is no market price, the difference between the contract price of ore consisting of 94% $BaSo_4$, plus freight (paid by plaintiff under the contract) and the average delivered price of all ore purchased by plaintiff during the term of the contract. This difference—$5.26 per ton—would then be multiplied by 12,009.85. The total measure of damages would be $63,171.81, excluding special damages.

■ The price at which the injured party purchases goods in substitution for those called for in the breached contract is relevant but not necessarily controlling. As I read the appellate court's decision (306 F.2d 725), if the defendant carries the burden of proving that the plaintiff could readily have secured substitute ore to meet its needs at a lesser price than what the plaintiff paid for the substitute ore, then the lesser price for which the plaintiff could have purchased the substitute ore is the fair price and is to be used in determining if there were any damages.

The evidence clearly indicates that there were sources in the ore-producing area of Missouri from which washed and jigged barytes ore of the quantity and quality specified in the contract could have been procured by the plaintiff at the time in question (other than that which plaintiff did buy from that area). Missouri is one of the largest ore-producing areas in the world. Although there is some contradictory evidence concerning the availability of the ore, the court finds that the plaintiff could have bought ore (that is, within the terms of the contract), which was cheaper in price than that which plaintiff paid, and yet high in quality. The evidence clearly shows that the plaintiff did not use reasonable diligence in buying substitute ore. The Court of Appeals at 306 F.2d 730, said, "It is true that evidence was introduced by Apex tending to show that there were sources in the ore-producing area in Missouri from which washed and jigged barytes ore of the quality specified in the contract might have been procured by the plaintiff, had it discovered them, at a lesser price than it paid for substitute ores purchased elsewhere, but not at $1.00 per ton in excess of the contract price." The problem in this case is in determining just how much in excess of the contract the plaintiff, exercising reasonable diligence, had to spend.

Before enumerating on the various sources available to plaintiff, it is important to note that plaintiff was quite interested in buying ore which had a very small percentage of iron content. The contract allowed a maximum of 3% iron content. The contract price was based on the barium sulphate content; however, the plaintiff was very interested in the iron content, as shown by the fact that there was a maximum of 3% provided for iron, and from this there could be no deviation. In fact, it was over the iron content that the plaintiff refused to accept defendant's ore and not the barium sulphate contents. In virtually every instance the ore purchased was much less

in iron content than allowable under the contract. This was usually the result of passing the ore through magnetic separators before stockpiling, which was done at an additional cost to the producer. Defendant's witness Thompson testified, and it is undisputed, that generally speaking, over the years a premium was given for ore low in iron content, and that when it ran one or two percent the premium would often run $2.50 to $5.00 per ton. Although the price under the contract was not determined by the iron content, it is still clear that it was quite important to the plaintiff. It was so important that plaintiff failed to buy from sources that had ore just under 3% iron content, but bought ore of lower iron content from places located far from plaintiff, or Mineral Point, Missouri (shipping point), thereupon having to spend sizable sums of money for shipping costs.

Plaintiff bought approximately 3½ million pounds (1,750 tons) of magnetically separated ore from Magnet Cove Barium Corporation in August, November and December of 1957. The ore was 97% barium sulphate and less than .5% iron content. The price was $21.50 per ton. The same ore with up to 3% iron content would have cost $17.60 ($15.50 plus $2.10 premium) under the terms of the contract; therefore, such ore cost $3.90 over the contract price. Magnet Cove also had ore available that was 94–96% barium sulphate and 2% iron content for $18.50. Assuming the ore averaged 95% barium sulphate, it would have cost $16.20 under the contract and, therefore, only cost $2.30 more than the contract price. George Carter testified that Magnet Cove had two piles of ore weighing 35,000 to 40,000 tons at the end of 1957, which was available to anyone. Magnet Cove had suitable ore available in sufficient quantity with a much lower iron content than the content allowed which plaintiff could have bought had it wanted to, and such ore would have been anywhere from $2.30 to $3.90 per ton more than the contract price.

Plaintiff offered into evidence plaintiff's Exhibits 20 and 21, which were allegedly typewritten notes prepared from dictaphone tapes. Betty Cummings testified that she typed notes from dictaphone tapes, but was not sure what notes she typed. Joe McKoane had no present recollection of the notes either. Plaintiff's Exhibit 20 says that Carter told McKoane on March 19, 1957, that he had no ore available. Even if the documents are admissible, they carry very little weight. Since Magnet Cove stockpiled such a large amount of ore by the end of 1957, it is clear that they had ore for sale during 1957 which would have met the plaintiff's requirements both as to quantity and quality.

J. F. Thompson of DeSoto, Missouri, testified that plaintiff made no inquiry during 1957 of ore for sale. Plaintiff's Exhibit 21 states that in March and September of 1957, DeSoto Mining had no ore available. Thompson testified further that he had 7,500 tons in April and 3,500 tons in December. He also had a magnetic separator and would have sold 97% barium sulphate ore of 1% iron content for $20.50. This would have been $2.90 per ton more compared to comparable ore under the contract.

Willard Politte testified that he had a mine located in Washington County, Missouri, which produced 500 to 600 tons per month. He had ore available for $15.50 which was within the terms of the contract. Politte testified that plaintiff did not contact him at any time during 1957.

MoBar (called such during the years 1955–57) consisted of four mines that had a total production of approximately 60,000 tons per year and had ore for sale which was 94% barium sulphate and two to three percent iron. The price was $14.50 per ton. There are evidentiary problems concerning hearsay and Judge Eversole's recollection of whether he talked to a representative of plaintiff in 1957. It is evident that MoBar did have ore that was within the terms of the contract. However, according to Graham, MoBar refused to sell plaintiff ore during 1957, as it was stockpiling it for mud drilling.

Therefore, the court does not include MoBar as a source of ore for purposes of the opinion.

■ From the above findings, the court is faced with the difficult task of determining a figure which represents the damages per ton for the ore purchased by the plaintiff. The court recognizes that plaintiff paid $5.26 per ton over the contract price, but also is of the opinion that the defendant has shown that plaintiff did not use reasonable diligence in purchasing substitute ore. The prior discussion shows the quality ore that plaintiff could have purchased, at what price, and in what quantities. Taking into consideration all relevant factors, except the low iron content of the ore available, the court is accordingly going to set plaintiff's damages at the sum of $3.00 per ton for the 12,009.85 tons, or $36,029.55.

With respect to the issue of whether the items of special damages claimed by plaintiff were within the contemplation of the parties at the time the contract was entered into and were caused by its breach, the Eighth Circuit at 306 F.2d 731, stated that such was a "question of fact  *  *  *."

■ The court finds that the plaintiff had no justification for purchasing a jaw-crusher or auxiliary loading equipment because there was an ample supply of washed and jigged ore available. It should be noted that plaintiff purchased the lump ore in the latter part of the year when ore was more available. For the same reasons, the court finds that plaintiff is not entitled to damages for additional expense of handling substitute ore.

The court sets the plaintiff's damages at $36,029.55.

This memorandum opinion will be adopted by the court as its findings of fact and conclusions of law, and the clerk will prepare and enter the proper judgment for the plaintiff against the defendant, Apex Mining Company, Inc., a corporation.