**BANNER IRON WORKS, INC.,**
Appellant,

v.

**AMAX ZINC COMPANY, INC., Appellee.**

**BANNER IRON WORKS, INC.,**
Appellee,

v.

**AMAX ZINC COMPANY, INC.,**
Appellant.

**Nos. 79–1302, 79–1343.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 3, 1979.

Decided April 10, 1980.

William J. Travis, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for appellant, Banner Iron Works; John J. Cole, Fred Leicht, Jr., St. Louis, Mo., on brief.

Robert M. Lucy, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for appellee, Amax Zinc Co.; Thomas C. Walsh and Michael B. McKinnis, St. Louis, Mo., on brief.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

Banner Iron Works, Inc., contracted to fabricate steelwork to be used in building certain highly specialized equipment for Amax Zinc Company, Inc. Numerous difficulties arose during the performance of the contract, however, and Amax called in other contractors to complete the job. Amax withheld payment to Banner and suit and countersuit were filed.

The circumstances surrounding the formation of the contract were as follows: After meeting with Amax representatives and studying the project plans and specifications, Banner submitted to Amax a written quotation for the steelwork on March 15, 1977. This bid was supplemented by letter of March 16, and a revised bid was submitted on March 22. On March 23, an Amax representative telephoned the Banner engineer assigned to the project, informing him that Amax would sent Banner a purchase order for the steelwork. That order was sent to Banner on March 24 and was signed and returned to Amax on April 1.

On June 13, 1977, Banner wrote a letter to Amax stating that, due to delays in steel delivery from its supplier, Banner "projected" a delivery date for the final steelwork that was two weeks later than the delivery date called for in the purchase order. Amax responded in writing about two days later, granting the two-week extension requested by Banner. On August 9, Banner requested an additional one to two-week extension for delivery of the steelwork. Amax denied the request and notified Banner that it was terminating part of the contract and assigning the work to other contractors. Amax contracted with various other companies to complete the contract work at substantially higher cost.

Amax paid Banner a total of $221,829, withholding $114,000 of the total contract price of $335,829. Banner maintained that it had supplied all of the materials and approximately eighty-five percent of the labor called for in the contract. It estimated the value of the remaining fifteen percent of the labor to be $27,687 and, there-

fore, claimed that $86,313 was due under the contract.

Banner brought suit to recover the contract price or, in the alternative, to recover in quantum meruit for the labor and materials supplied. Amax counterclaimed for breach of contract, claiming it had paid $206,547 to other contractors to complete the work that Banner was obligated to perform. The jury returned a verdict in favor of Banner in the amount of $75,000 on its quantum meruit claim and in favor of Amax in the amount of $150,000 on its counterclaim, leaving Amax with a net recovery of $75,000. Both parties appealed.

## I

■ Banner's first contention on appeal is that the district court erred in refusing to allow closing argument or jury instructions informing the jury that it could find the delivery dates to be conditioned on the securing of steel from April mill rollings. Banner relies on two provisions of its written quotation of March 22, 1977. The typewritten portion of the quotation included the following:

Based on a prompt award of a contract and the securing of April mill rollings on items where accumulated tonnages are required, we would begin sequenced deliveries starting August 1, 1977 and complete August 15, 1977.

In addition, a printed notation near the top of the quotation's first page declared:

All contracts and agreements are contingent upon strikes, differences with workmen, fires, accidents, delays of carriers, rolling mills, and all other delays unavoidable or beyond our control.

Banner's position is that these terms in the quotation were part of the contract agreed upon by the parties. At least, Banner argues, the jury should have been permitted to find the April mill rolling contingency to be part of the contract.

We disagree. This Court has consistently held that the determination of whether a given set of writings constitutes a valid contract is a question of law to be determined by the Court. *See Neff v. World Publishing Co.*, 349 F.2d 235, 253 (8th Cir. 1965); *Canton Cotton Mills v. Southwest Overall Co.*, 8 F.2d 807, 810 (8th Cir. 1925). Hence, the district court did not err in refusing to submit the mill rolling contingency issue to the jury.

■ We are also convinced that the district court correctly ruled on the merits of the contingency issue. Banner's quotation of March 22 was just that—a quotation. Although in some circumstances such a quotation may be construed to be an "offer," the acceptance of which forms a contract, no evidence of acceptance was presented in this case. In the March 23 telephone call, the Amax representative stated that Amax would send a purchase order to Banner. That purchase order, sent on March 24, was the true "offer" in this case. When Banner officials signed the purchase order and returned it to Amax on April 1, the offer was accepted and the contract formed. Since the terms of that purchase order agreed to by Banner included no mill rolling contingency, neither did the contract.

Moreover, the purchase order contained express terms that clearly show that the delivery dates were not conditional. The order stated:

Award of this contract was contingent upon scheduled deliveries of all purchased items under this order between Aug. 1, 1977 [and Aug. 15, 1977 [1]]. Time is of the essence to AMAX due to the critical nature of the ordered parts to AMAX Mfg process. The delivery schedule must be met.

The purchase order also contained the following printed statements:

1. Terms of this purchase order prevail and only a signed consent by us will be binding if your terms are in conflict with the terms stated on the reverse side of this order.

\*    \*    \*    \*    \*    \*

2.a. The purchase Order and these General Terms and Conditions from [sic] the entire contract between the parties,

---

1. Although the purchase order contained a typographical error, the parties have stipulated that the delivery dates specified should have been August 1 to August 15.

and no variation thereof, irrespective of the wording or terms of the Seller's proposal or acceptance of the order, will be effective unless specifically agreed to in writing by the Purchaser.

\* \* \* \* \* \*

7. If any of the provisions of Seller's proposal or Seller's other writing are in conflict with the terms of this purchase order, the terms of this purchase order shall govern.

These terms leave no doubt that the purchase order was intended to embody the final agreement between the parties and that the agreement required prompt delivery without providing a mill rolling contingency.

■ Furthermore, there is an alternative but equally compelling reason for refusing to hold that the delivery dates were subject to a mill rolling contingency: new terms relating to delivery dates were later agreed to by both parties. Banner's June 13 letter "projected" the need for a two-week extension due to problems with the steel supply.[2] When Amax assented to this arrangement, the new delivery terms were fixed. Under the circumstances of this case, where Banner had been notified from the outset that time was of the essence, there is no merit to Banner's contention that its "projection" was merely a rough estimate that had no binding effect.

II

■ Banner next assigns as error the giving of jury instruction 13, which reads as follows:

Furthermore, if you find that after the steel was delivered to Banner, the parties agreed upon a new firm delivery schedule and that Banner failed to deliver the materials ordered in accordance with that new schedule, then you must find that Banner's failure to deliver under these circumstances was not excused.

Banner argues on appeal that this instruction was erroneous in that it imposed an absolute performance requirement while substantial performance is the correct legal standard. We need not decide whether this contention is correct, however, because Banner failed to object to instruction 13 on this ground at the time of trial. Banner's proposed instruction 10A, which Banner asserts properly stated the applicable performance standard, does not refer to substantial performance. Instead, it proposes that Banner's performance should be considered timely if "all reasonable efforts" were made to meet the revised performance dates "projected" by Banner on June 13. This instruction does not correctly state the law, nor can it be considered to be an objection to instruction 13 on the ground that substantial performance is the correct standard.

III

■ Banner also complains of the trial court's refusal to admit into evidence, on relevancy grounds, testimony concerning an alleged $400,000 "underrun" on other portions of the construction project at the Amax plant. Specifically, Banner contends that, because of the delay caused by Banner, Amax was able to reschedule workers to other capital projects in the plant, thus reducing the costs of other projects by $400,000. This cost decrease, Banner argues, should be considered to be an "expense saved in consequence of the seller's breach" within the meaning of U.C.C. § 2–712(2) and should thus be allowed as an offset against Amax's counterclaim for damages due to breach of contract.[3]

This argument is without merit. The $400,000 is in no way an "expense saved in consequence" of Banner's breach. First, the $400,000 figure represents the difference between Amax's initial budget for capital improvements in other portions of the

---

**2.** The letter stated:

As a result of the problems which occured [sic] at the mill, we are anticipating a delay in the shipment of the precipitators. At this time, we project a delivery date on precipitator for No. 2 the week of August 15, 1977.

Precipitator No. 1 would follow the week of August 29, 1977.

**3.** Section 2–712(2) of the U.C.C., codified as Mo.Ann.Stat. § 400.2–712(2) (Vernon), provides as follows:

plant and the actual cost of those improvements. Thus, the "savings" may be simply due to an over-estimation of the cost of the project. More importantly, any "savings" caused by reassignment of workers cannot properly be considered to be "in consequence" of Banner's breach. Amax's ability to reassign workers did not depend on Banner's breach of the contract. Alternative use of plant personnel could have occurred even if Banner had fully performed on time. Amax's counterclaim charges Banner with the cost of the work necessary to complete the work Banner had agreed to do. As the breaching party, Banner would be liable for those costs whether or not Amax rescheduled its workforce. We would have a different case if Amax was attempting to collect from Banner the wages of those workers while they worked on other projects as well as the overtime charges incurred after the steelwork arrived. But Banner was not charged for the time the workers labored in other areas of the plant. As detailed in the next section of this opinion, the counterclaim was designed to compensate Amax for the amount paid to other contractors for completing the work under the contract.

### IV

Banner's fourth assertion on appeal is that the award to Amax on its counterclaim improperly includes amounts for work that was not Banner's responsibility under the contract. Banner contends that part of the charges made for work done by Brooks

> The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 400.2–715), but less expenses saved in consequence of the seller's breach.

4. Plaintiff's proposed instruction 26 reads as follows:
> Banner has asserted certain affirmative defenses to the counterclaim.
> Your verdict must be for Banner on the counterclaim if you find that Banner has established any one of the following defenses by a preponderance of the evidence:
> That Banner fabricated and delivered the precipitator shells and related steelwork in a timely manner, or

Erection Company were for field assembly and erection work—work that was to be performed by the field contractor, not Banner.

We are satisfied that Banner is not entitled to a setoff for these charges beyond that already given by the jury. Although there was much dispute about the nature of the work performed by Brooks Erection Company, the record contains substantial evidence indicating that the amounts claimed in Amax's counterclaim were for work made necessary by Banner's failure to make timely and complete delivery. This issue was properly submitted to the jury. It appears that the jury found some of the charges to be excessive; it awarded Amax only $150,000 on its $206,547 counterclaim.

### V

The next ground for appeal raised by Banner is that the district court erred in refusing to give plaintiff's proposed jury instruction 26. That instruction stated, in part, that the verdict must be for Banner on the counterclaim if the jury found that Amax did not act in good faith when it took portions of the contract work from Banner and assigned them to others.[4] Banner asserts that there was evidence in the record from which the jury could have inferred that Amax did not act in good faith. Specifically, Banner argues that Amax unreasonably refused to allow Banner a second extension of the delivery date and it allowed others to complete the work at inflated cost.

> That any delays by Banner in fabrication and delivery of the precipitator shells and related steelwork were excused, or
> That Amax did not act in good faith when it removed certain portions of the work on the precipitator shells and related steelwork from Banner, made other contracts for this work, and withheld from Banner amounts paid under these other contracts.
> As has been said, the burden of establishing these affirmative defenses is on Banner. Amax is not obliged to call any witnesses or introduce any evidence concerning Banner's affirmative defenses.
> The term "good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.

Although there is some evidentiary support for each of these assertions, and although the district court could have been more explicit, we are satisfied that the jury instructions presented these issues to the trier of fact in a manner that did not prejudice Banner. The district court properly instructed the jury on the conditions under which Banner's failure to render timely performance would be excused. If no such excuse existed, as the jury apparently found, there would be no basis for finding that Amax's refusal to extend the delivery date a second time was in bad faith. Moreover, the district court instructed the jury that Amax could be awarded on its counterclaim those sums "expended in a *reasonable* manner to obtain the labor and materials that should have been provided to Amax by Banner in a timely manner." (Emphasis added.) The "reasonable" standard is even more favorable to Banner than is a "good faith" standard. Thus, no prejudicial error was committed.

### VI

Banner's final contention is that the district court erred in permitting two Amax witnesses to testify as experts on steel fabrication methods. Banner maintains that the two witnesses were not qualified as experts within the meaning of Fed.R.Ev. 702 because they had no training or experience with steel fabrication.

■ Although there may be some dispute about the witnesses' qualifications in this case, determination of such qualifications is a matter left to the discretion of the district court. *See Soo Line R. Co. v. Fruehauf Corp.*, 547 F.2d 1365, 1374 (8th Cir. 1977). In view of the two witnesses' strong backgrounds in steel construction and engineering, we cannot say that the trial court abused its discretion in permitting them to testify on steel fabrication methods.

### VII

In its cross-appeal, Amax asserts that the district court erred in submitting Banner's quantum meruit claim to the jury. It argues that Banner affirmed the existence of the contract when it brought its action for breach of contract and, therefore, its inconsistent quantum meruit claim should have been dismissed.

■ There is some doubt whether, under Missouri law, a plaintiff is required to elect between a quantum meruit theory and a contract theory before the claim is submitted to the jury. *Compare Boyd v. Margolin*, 421 S.W.2d 761, 768 (Mo.1967) (dictum) *with Kaiser Alum. & Chem. Sales, Inc. v. Lingle Refrig. Co.*, 350 S.W.2d 128, 131–132 (Mo.App.1961). We need express no opinion on that issue, however, since it is clear that, regardless of the requirements imposed on the plaintiff, the district court may not enter judgment on a verdict that is inconsistent on its face. In this case, the court has done just that. The jury necessarily found that a valid contract existed when it found for Amax on its counterclaim. Since the finding of a valid contract precludes recovery on a quantum meruit theory, Banner's quantum meruit claim cannot be sustained.

Banner vigorously objects to this conclusion, arguing that refusing to allow its quantum meruit claim would result in a great windfall for Amax. Banner posits the situation in which a non-breaching buyer obtains alternative performance from a second seller and then refuses to pay anything to the original seller who has partially performed the contract. Unless a quantum meruit claim is permitted, Banner argues, the original seller would be left in a most unpleasant position: If sued for breach of contract, he could be forced to pay the buyer's cost of obtaining alternative performance, but he would be unable to recover from the buyer the value of the partial performance, even if it was substantial.

■ This result would, of course, be grossly unfair, but Banner is mistaken in concluding that a quantum meruit claim is the appropriate means to ensure that such inequity does not occur. The mistake is the result of a fundamental misunderstanding of the parties' rights and liabilities in alternative performance or "cover" situations. The rationale for permitting cover—indeed, for all contract law—is to give the non-breaching party the opportunity to put himself in the position in which he would have

been had there been no breach. As this Court has noted,

> " * * * The guiding principle of the law in cases arising on breaches of contracts for the sales of personal property is to give the aggrieved party the benefit of his contract by putting him in as favorable a condition as he would have enjoyed if the other party had performed, instead of violating, his agreement; in other words, to afford full indemnity for the breach."

*Apex Mining Co. v. Chicago Copper and Chemical Co.*, 306 F.2d 725, 730 (8th Cir. 1962) (quoting *St. Louis Steel Range Co. v. Kline-Drummond Mercantile Co.*, 120 Mo. App. 438, 96 S.W. 1040, 1042 (1906)).

What has apparently been overlooked throughout the proceedings in this case is that, to obtain the benefit of his bargain, the non-breaching buyer must "pay" the contract price. The U.C.C. provision relating to cover specifically recognizes this. U.C.C. § 2–712(2) provides: "The buyer may recover from the seller as damages the *difference between the cost of cover and the contract price* together with any incidental or consequential damages * * *." (Emphasis added.) Hence, the contract price must be subtracted from the cost of cover to determine the liability of the breaching party.

In this case, Amax claimed that to complete the contract work it had expended $206,547 over and above the $221,829 paid to Banner. As noted earlier, Banner disputed whether this amount accurately reflected the costs of completing the contract work and the jury apparently believed $206,547 to be an inflated figure. Acting under the direction to "award [Amax] such sum as you believe it expended in a reasonable manner to obtain the labor and materials that should have been provided to Amax by Banner in a timely manner," the jury concluded that Amax was entitled to $150,000. The difference between the cost of cover as found by the jury, then, and the $114,000 remaining unpaid on the contract is $36,000. This figure correctly represents Amax's damages.

Accordingly, the cause is remanded to the district court with directions to enter judgment for Amax on its counterclaim in the amount of $36,000, plus interest and costs. The district court's judgment awarding $75,000 to Banner and $150,000 to Amax is vacated.[5]

---

5. We note that the purchase order that formed the contract in this case contained the following clause:

> 10. ARBITRATION. Any controversy or claim arising out of or relating to this contract, or any breach thereof, shall be settled in accordance with the Rules of the American Arbitration Association, and judgment upon the award may be entered in any Court having jurisdiction thereof.

There is no indication in the record why this clause was ignored by Banner and Amax. We note that Missouri courts have held that they will enforce commercial arbitration awards. *See, e. g., Masonic Temple Association of St. Louis v. Farrar*, 422 S.W.2d 95 (Mo.App.1967); *Thatcher Implement & Mercantile Co. v. Brubaker*, 193 Mo.App. 627, 187 S.W. 117 (1916).