**B. B. WALKER COMPANY, a corporation, and Harrelson Rubber Company, a corporation, Plaintiffs,**

v.

**ASHLAND CHEMICAL COMPANY, a division of Ashland Oil, Inc., a corporation, Defendant.**

Civ. A. No. C–75–504–G.

United States District Court, M. D. North Carolina, Greensboro Division.

June 26, 1979.

---

652

Jack W. Floyd, James A. Medford, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for plaintiffs.

William F. Maready, Winston-Salem, N. C., Robert W. Hallock, Chicago, Ill., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, B. B. Walker Company and Harrelson Rubber Company, brought this action against defendant, Ashland Chemical Company, alleging that defendant breached a contract by the terms of which defendant was to supply plaintiff Harrelson with a quantity of a product known as master-batch (styrene-butadiene rubber), a primary ingredient of retread rubber manufactured and sold by Harrelson. Plaintiffs allege, in addition, that defendant's conduct constituted a common law tort as well as unfair competition, in violation of Chapter 75 of the General Statutes of North Carolina, and price discrimination, in violation of Title 15, United States Code, §§ 1, 2 and 13(a).

B. B. Walker Company (hereinafter "Walker") is a corporation organized under the laws of the State of North Carolina with its principal place of business in Ashboro, North Carolina. Harrelson Rubber Company (hereinafter "Harrelson" or "plaintiff"), is a corporation organized pursuant to the laws of the State of Delaware with its principal place of business in Ashboro, North Carolina. Walker owns 82% of Harrelson's corporate stock, and the contract in issue was negotiated by Walker for the benefit of Harrelson. Ashland Chemical Company (hereinafter "Ashland"), was at all times relevant to the instant litigation, an unincorporated division of Ashland Oil, Inc., a corporation organized under the laws of the State of Kentucky and qualified to do business in North Carolina.

The parties thus being of diverse citizenship, the amount in controversy in this suit exceeding $10,000.00, exclusive of interest and costs, jurisdiction over the breach of contract claim appropriately lies pursuant to 28 U.S.C. § 1332. The Court has assumed pendent jurisdiction over the state tort and unfair competition claims; jurisdiction over the federal antitrust claim is appropriate under 15 U.S.C. § 15 and 28 U.S.C. § 1337.

The matter came on for trial by the Court on December 1, 1978. At that time, for reasons stated from the bench which the Court reaffirms and incorporates herein, the Court granted plaintiffs' motion for partial summary judgment on the breach of contract claim. Thereafter, prior to the introduction of evidence, plaintiff in open court announced its intention not to pursue its Sherman Act claim. Now pending before the Court, therefore, are the claims of (1) whether the defendant breached the entire contract; (2) what damages plaintiff may recover on account of defendant's breach of contract; (3) whether plaintiff breached a contract dated June 16, 1972; and (4) whether defendant is liable additionally for a common law tort, a violation of Chapter 75 of the General Statutes of North Carolina, and/or a violation of the Robinson-Patman Act, 15 U.S.C. § 13. Based on the evidence in the record and adduced at trial, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW:

For some years prior to February 1973, Harrelson had been in the business of manufacturing and selling rubber and repair materials which it sold to the tire retreading industry in the United States and abroad. Commencing approximately the year 1971, Harrelson purchased substantially all of its needs of five different grades of masterbatch, a derivative of crude oil and a basic material in the manufacture of synthetic tread rubber, from Ashland; and by February of 1973, Ashland had become Harrelson's exclusive supplier, excepting certain spot purchases made by Harrelson for the purpose of testing competitive masterbatch.[1]

Pursuant to the terms of a contract dated June 16, 1972 between the parties, Harrelson was obligated to purchase from Ashland a minimum of thirty million pounds of masterbatch at the prices set forth in that contract, which, however, were lower than those set forth in a contract entered into between the parties in February 1973—which contract the Court has found was breached by Ashland.

Ashland counterclaimed against Harrelson for profits it contends it lost by reason of Harrelson's failure to take the aforementioned minimum of 30 million pounds of masterbatch under the contract of June 16, 1972.[2] While the Court concludes that Harrelson was indeed bound under the 1972 contract to take the specified minimum of 30 million pounds, the Court finds that in light of the increase in price under the contract of February 1973, Ashland waived that requirement. Ashland's inducement for waiving that requirement was that in addition to the fact that the higher price was called for in the February 1973 contract, Ashland had for some months preceding July 1973 sold more masterbatch than it produced while it operated at or above the stated capacity of its Baytown, Texas plant, wherein it manufactured masterbatch. Judgment will be entered for the plaintiff on this counterclaim.

The February 1973 contract specified that time of delivery and mixture of grades were to be coordinated between the parties. The Court finds that the clear intent of the parties was to the effect that Harrelson had the right to specify delivery in product mix of whatever rate and mixture its manufacturing operations required from time to time. The evidence as a whole establishes that the February 1973 contract was a requirement or needs contract calling for a specified minimum. Neither party contemplated resale by Harrelson of the masterbatch to be purchased from Ashland. The prior dealings between the parties establishes the fact that Harrelson's manufacturing requirements and Ashland's shipments to Harrelson greatly fluctuated from month to month, although the parties experienced no difficulty with the coordination of deliveries of required types of masterbatch prior to October 1973. The agreement of the parties under the contract in issue was that Harrelson was entitled to purchase 50 million pounds of masterbatch for use in its manufacturing process, to be delivered at such rate as Harrelson required. Ashland's contention that Harrelson was required to take pro rata portions monthly during the contract is specious, and is not supported by the evidence.

The Court finds that in light of the well publicized energy crisis, the parties entered the contract of February 23, 1973, with full knowledge of an impending shortage of petrochemicals stemming from disruption in the supply of crude oil. The contract in controversy provided for delivery of five

---

1. The initial contract between the parties was actually entered into in April 1969, calling for delivery of a specified amount of masterbatch. Several other contracts were entered into between the parties prior to the contract in issue in this cause, each of which called for a minimum number of pounds to be purchased by Harrelson. With the possible exception of one of those contracts, in each instance Harrelson's purchases fell short of the minimums called for under the respective contracts.

2. Plaintiff had taken, under the June 1972 contract, all but 8,801,656 pounds of masterbatch called for thereunder.

different grades of masterbatch, FOB destination, during the period July 31, 1973 through July 31, 1974. In early 1973, and shortly after the execution of the contract of February 23 of that year, and by virtue of a cash loss occasioned by actions by the Chairman of the Board of Directors of B. B. Walker Company, a severe financial strain was placed upon both B. B. Walker Company and its subsidiaries, including Harrelson. In May of 1973, the Senior Vice-President of Ashland's chemical division suggested to his colleagues of Ashland Petroleum Company that Harrelson appeared to be a favorable candidate to be acquired by Ashland Oil, Inc. as a complement to Ashland Oil's involvement in its own retread subsidiary known as O.K. Tire and Rubber Company. The Court finds that the possibility of acquiring Harrelson Rubber Company had been discussed at Ashland and it was the conclusion of Ashland that its subsidiary, O.K. Tire and Rubber Company, was in the position that it either had to increase its business or cease engaging in the tread rubber business. The evidence further discloses that pursuant to increasing O.K. Tire and Rubber Company's business, Ashland caused additional specialists in tread rubber sales to be retained, and training programs were instituted to prepare all of Ashland's tire, battery and accessory salesmen to sell tread rubber. Both Ashland and its subsidiary O.K. Tire and Rubber Company knew, prior to February 1973, that there would be a shortage of the ingredients of tread rubber, and it is obvious that Ashland intended to use its control over the raw materials to maximize their profits in the shortage economy.

In June 1973, prior to the time fixed for the first deliveries under the February 1973 contract, certain officials of Ashland requested that Harrelson grant an increase over the prices called for in that contract. The reason assigned for the request was the rising cost of petrochemicals. Harrelson understandably declined any such suggestion. During the summer months of 1973, Harrelson built its inventory of masterbatch from Ashland by designating deliveries of masterbatch under the prior contract

which called for a price six-tenths of a cent less per pound than specified in the February 1973 contract. The fact that Harrelson projected depletion of its inventory by late October, 1973, to the end that it would not have any masterbatch by November 1, 1973, was well known by the officials of Ashland.

In October 1973, manufacturers of masterbatch nationwide had begun to allocate their production and were generally declining to sell to new customers without a historical purchasing pattern from them. Since Harrelson for some years prior thereto had purchased the bulk of its requirements from Ashland, Harrelson had great difficulty in obtaining masterbatch from any manufacturer other than Ashland. Harrelson's purchases of masterbatch from suppliers other than Ashland during the purchase order period in controversy were spot purchases amounting to 2,464,111 pounds, all between November 1973 and July 1974. The record reflects that for the first three months of the contract period, i. e., August, September and October of 1973, Harrelson ordered and received from Ashland less than 310,000 pounds of masterbatch. This relatively small amount was occasioned by the fact that Harrelson had sufficient inventory accumulated under the prior agreement at a lower cost to them as called for in the June 1972 contract, than called for under the contract of February 1973. The evidence discloses that by August 1973, Ashland's executives began to inquire of their corporate counsel how to avoid the Harrelson contract. Various alternatives and courses of action, including the possibility of the defense of commercial impracticability were considered. However, on September 6, 1973, Ashland's counsel advised its business executives that the contract could not legally be breached in light of the fact that Ashland could not anticipate a loss on sale of masterbatch to Harrelson at the contract prices during the calendar year 1973.

In September of 1973, officials of Ashland falsely informed Harrelson that Ashland was suffering great losses on the sale of the masterbatch to Harrelson at the con-

tract prices, and as a consequence, because of a fear of cessation of deliveries by Ashland, Harrelson was required to consent to a price increase of six-tenths of a cent a pound, or $300,000.00 on the contract amount. The fact of the matter was that Ashland would not have suffered a loss on the contract during 1973. Harrelson's personnel advised Ashland that they would not consent to Ashland's request for a cancellation of the February contract because that contract had been attached to loan agreements with some thirty-seven banks, and it was essential to the operation of Harrelson's business that its bank agreements be fulfilled, for they contained the condition that cancellation of the contract would constitute an event of default of the terms of the loan agreements.

By late October 1973, Harrelson, having depleted its masterbatch inventory, began to request shipments in large quantities pursuant to the February 1973 agreement. Ashland's personnel informed Harrelson that they did not have the particular grade of masterbatch as requested by Harrelson in inventory. The evidence reflects that such statement was false since Ashland's inventory records revealed that the grade of masterbatch ordered by Harrelson was then, in fact, in Ashland's inventory. Indeed, the evidence reflects that subsequent to October 25, 1973, the date of Harrelson's order, Ashland's rubber shipments summary shows that O.K. Tire and Rubber Company was shipped that specific grade. Finally, upon satisfying itself that Harrelson would not agree to any further variation in the price and terms of the February contract, Ashland made a deliberate decision not to ship masterbatch to Harrelson.

On November 5, 1973, Harrelson was advised by Mr. Stimets of Ashland, that Ashland intended not to honor the contract unless Harrelson agreed to pay Ashland's price upon Ashland's terms. At that particular time, Harrelson, lacking its required masterbatch, was faced with financial disaster, and through its Mr. Donnell told Mr. Stimets to ship the masterbatch, and at the same time requested a meeting with Mr. Stimets' superiors, which meeting was arranged for November 19, 1973.

The meeting was held as scheduled, without any commitment of relief to Harrelson being made by Ashland's officials present, who represented that they had experienced a severe shortage of raw materials and were allocating their production to all of their customers. The latter statement was untrue, as Ashland did not allocate production until January 1974.

The record reflects that between November 1 and November 19, 1973, Harrelson, despite much effort, was unable to obtain an alternate source of supply of masterbatch. On November 29, 1973, a further meeting was held between officials of the respective companies at which time Ashland's officials assured Harrelson that all customers were being treated equally and that Ashland would do its best to take care of Harrelson's requirements. The evidence reflects that such statement was false, that Ashland's Mr. VonDoersten had issued instructions to ship its subsidiary, O.K. Tire and Rubber Company, all of the masterbatch it could use. Similarly, the decision had been made by Ashland to favor large purchasers of carbon black with scarce masterbatch supplies in order to advance Ashland's sales of carbon black.

In November and December, 1973, Ashland ceased producing four of the five grades of masterbatch which were the subject of the February 1973 contract, the consequence of which was to require Harrelson to accept the grade that Ashland would deliver. Harrelson made unsuccessful efforts to obtain sufficient masterbatch for its needs from other sources. Ashland, with full knowledge that Harrelson had a need of no less than 3,000,000 pounds per month as a financially breakeven point, shipped Harrelson 2,189,097 pounds of masterbatch in November, and 2,351,659 pounds in December, 1973. During those months, Ashland continued to supply O.K. Tire and Rubber Company with all of the masterbatch it could use, and generally filled the orders of its other customers. As the Court found in ruling on the motion for summary judg-

ment, Ashland breached its contract when, the specific date being November 1, 1973, Ashland refused to ship merchandise under it. The Court finds that this refusal was a deliberate, calculated, purposeful effort on the part of Ashland to force Harrelson to accede to the higher prices and change in terms which included the imposition of freight charges and, as the evidence reflects, to deliberately injure Harrelson's business. Even after Harrelson acceded to the change in terms, while Ashland assured Harrelson that it would receive its fair share of the Baytown plant's production based upon Harrelson's historical purchasing pattern, such did not come to pass. By April, 1974, Harrelson Rubber Company had received four million pounds less than its fair share of the Baytown production under Ashland's allocation plan, while O.K. Tire and Rubber Company received masterbatch at record levels, doubling its historical production rates. The evidence discloses that the Baytown production plant was instructed by officials of Ashland to "push back down the production line" the grades of masterbatch being requested by Harrelson. While Ashland's internal memoranda purports to assign legitimate reasons for the shortfall to Harrelson, the Court has concluded that Ashland prepared such memoranda for the purpose of establishing a false documentary record.

Ashland's suggestion that Harrelson's purported acquiescence to contract changes was a binding ratification is contrary to the massive weight of the evidence of continued wrongful conduct by Ashland. The realities of the market combined with Harrelson's compelling need for masterbatch during the contract period put Harrelson at Ashland's mercy. Ashland ruthlessly capitalized on its dominant position.

Moreover, the Court is satisfied that the purported arrangement between Harrelson and Ashland, allegedly made to assure Harrelson of its fair share of masterbatch, was simply a device to permit Ashland to increase its profits at Harrelson's expense. The evidence further discloses that while Ashland was refusing to supply Harrelson in the manner to which it was entitled, even at the higher prices after its breach of contract, it was in fact reducing the prices to O.K. Tire and Rubber Company, a major competitor of Harrelson. In light of the fact that all of O.K. Tire and Rubber Company's stock had been acquired by Ashland prior to the year 1973, the only reasonable conclusion that the Court may reach is that such conduct was calculated to the end that O.K. Tire and Rubber Company could continue, as it did, to supply Harrelson's customers at prices lower than Harrelson's cost.

Additionally, with full knowledge of Harrelson's precarious financial position compounded by Ashland's breach, Ashland's salesmen called on Harrelson's customers distributing Ashland calling cards, attempting to get those customers to deal with O.K. Tire and Rubber Company by advising the customers that regardless of the price Harrelson was charging, O.K. Tire and Rubber Company would charge less. Additionally, Ashland's representatives would obtain samples of Harrelson's material from the various customers and secure laboratory testing reports describing Harrelson's product in derogatory terms, which reports were communicated by the salesmen to Harrelson's customers. This conduct was the more onerous by virtue of the fact that any such inferior production by Harrelson was occasioned by Ashland's refusal to supply the grades of masterbatch requested. Indeed, a major point made by Ashland's salesmen and O.K.'s executives was to the effect that because O.K. Tire and Rubber Company was a subsidiary of Ashland, O.K. Tire and Rubber Company could continue to supply rubber at times that Harrelson could not. Ashland's ruthless disdain for fair competitive practices was further manifested by the fact that Harrelson's largest single customer, Prior Tire Company, was told by a representative of O.K. Tire and Rubber Company that Harrelson was in serious financial difficulty and more than likely would not remain viable as a supplier, while at the same time indicating that soon thereafter O.K. Tire and Rubber Company would be operating from Harrelson's plant. The

Court characterizes the conduct of both Ashland and O.K. Tire and Rubber Company as not only unfair to Harrelson, but representative of the most despicable sort of predatory and unprincipled business conduct. While the evidence reflects that during the period that Ashland was purportedly instructing its salesmen not to interfere with Harrelson's accounts, it was attempting to, and did, supply to Robins Tire and Rubber Company, a primary competitor of Harrelson, with 107% of its normal allocation in the first quarter of 1974, while during the same period it was causing Harrelson great difficulty in acquiring its minimum masterbatch needs. Ashland's failure to abide by its contractual obligation was compounded by the conduct of its salesmen. Ashland was fully aware that it was Harrelson's only source of supply and that Harrelson was experiencing great difficulty in supplying its customers at any price. Further, the evidence reflects that salesmen from Ashland and O.K. Rubber Company told Harrelson's customers that Harrelson had intentionally reduced the quality of its tread rubber by purchasing Ashland's cheaper, lower quality masterbatch than had been Harrelson's custom. In addition, Ashland's salesmen and O.K. Tire Company's executives assured Harrelson's customers that because O.K. Tire Company was a subsidiary of Ashland, it could continue to supply rubber that Harrelson could not. The Court further finds that interoffice memos were written by Ashland's executives, the purpose of which were efforts to record a purported justification of its refusals to ship masterbatch to Harrelson. The Court is more than satisfied that the actions heretofore described, including the deliberate withholding of masterbatch from Harrelson, were taken for the sole purpose of injuring the plaintiffs' business.

Ashland, who had theretofore granted plaintiff payment terms of 60 days reduced those terms to 30 days; and at least in one instance, required payment in advance, as a consequence of which plaintiff was forced, for financial reasons, to put all of its customers on the same terms. Ashland's extortion of higher prices from plaintiff, and its unilateral change of terms, caused plaintiff to cease its practice of consignments to customers and raise its prices. These factors, coupled with Ashland's failure to deliver certain grades of masterbatch ordered by plaintiff, even when such grades were in Ashland's inventory, as well as its failure to coordinate shipments, caused a loss of certain customers to plaintiff.

Despite the above stated facts, the Court is not satisfied that Ashland's conduct, excluding the breach of contract, resulted in any specific quantifiable financial damage to the plaintiff. For the fiscal year ending November 3, 1973, Harrelson reported in its 10–K (annual report pursuant to §§ 13 or 15(d) of the Securities Exchange Act of 1934) the following:

> The Registrant's principal raw material is Masterbatch, a derivative of crude oil. Being petroleum based, in December, 1973, Masterbatch came into short supply relative to the needs of the Registrant. Such overall nationwide shortage may in time create a serious problem for the company *though the company's needs have been met to date* and I believe covered for the immediate future. The Registrant's main supplier of Masterbatch placed all of its customers on allocation; but the company was able to fill the deficiency by purchasing quantities of Masterbatch at higher prices on the open market on a spot basis. (Emphasis added.)

Additionally, for the fiscal year ended November 2, 1974, Harrelson reported to the Securities Exchange Commission as follows:

> With the advent of the oil embargo on shipments to the United States by certain Arab states, the Registrant early in fiscal 1974 experienced shortages in Masterbatch and other raw materials used which were petroleum based. Its principal supplier of Masterbatch reduced considerably the quantity shipped to the Registrant by placing it on an allocation basis. *The Registrant's management secured needed quantities of Masterbatch from other sources domestic and foreign, and was able to fill orders with a minimum of delay.* (Emphasis added.)

Additionally, in January 1974 Harrelson reported to its customers:

> We at the Harrelson Rubber Company have also been "scrambling", fortunately with success. Orders have been coming in at an increased rate, but no orders have been turned down because of shortage of materials. Neither have we had to put our customers on allocations. Surely, our shipments have not been as prompt as before, but deliveries are being made, and without much delay.

In February 1974 Harrelson informed its customers that: "In spite of a general shortage of raw materials for the rubber industry, our company is fortunate to be able to ship tread rubber, cushion gum, etc., promptly, and in any quantity desired." The evidence discloses that the situation was the same as of March 1974.

The evidence further discloses that in fiscal 1974 Harrelson produced 5,901,417 more pounds of tread rubber than it actually sold, and actively sought additional business. Plaintiff has failed to satisfy the Court by a preponderance of the evidence that it lost any sales volume or profit on account of Ashland Chemical's conduct, excluding its breach of contract, and no specific quantifiable monetary damages have been shown to have emanated from what the Court deems to be Ashland's tortious conduct.

While Harrelson contends that, but for the breach of contract, it could have produced 71,750,000 pounds of tread rubber in fiscal 1974, such has not been substantiated by the evidence. Indeed, Mr. Harrelson, Chairman, in June 1974 reported to the Board of Directors of plaintiff that a shortage of labor was a contributing factor in not shipping larger quantities of tread rubber.

Further, the Court finds that in light of its sworn statements to the Securities and Exchange Commission hereinabove referred to, coupled with Harrelson's historical record of production and its failures to take the minimum quantities called for in previous dealings with Ashland, Harrelson would not have required within the contract period any more masterbatch than it actually purchased from Ashland and others. Indeed, had not Ashland's conduct, prompted by its desire to extract additional profits and to subject Harrelson to financial distress, resulted in its breach of the contract in issue, it might well have had a cause of action against Harrelson at the end of the contract period for failure to take the minimum poundage called for thereunder.

Indeed, the record reflects that in April 1974, Harrelson informed the defendant that it would not take the first shipment of masterbatch from Ashland Chemical under a "tolling" agreement, to which further reference will be made *infra,* supporting the Court's conclusion that Harrelson then had a quantity of masterbatch that was required for its then needs. It is to be noted as well, however, that since this was within the contract period, the choice was Harrelson's to make. The record further reflects in connection with this particular aspect, that Harrelson paid in full for that specific masterbatch prior to the expiration of the contract period, although the first delivery was not made until after the contract period.

Despite the Court's conclusion that Ashland's tortious conduct resulted in unquantifiable damages to the plaintiff, there is no doubt that Ashland, by its breach of the contract caused plaintiff substantial quantifiable monetary damages. Indeed, in efforts to obtain masterbatch at any price, Harrelson agreed to the "tolling" arrangement to which the Court has made reference, proposed by Ashland during the meetings heretofore referred to which were held in November 1973. Pursuant to that agreement, Ashland, through its Canadian Division, was to obtain the chemical toluene which it was to trade to Dow Chemical Company for scarce budatiene and then convert the budatiene to masterbatch at a "tolled" price. As it developed, that "tolling" arrangement was but another device to permit Ashland to increase its profits at Harrelson's expense. By January 17, 1974, Ashland's Canadian Division had obtained 200,000 to 250,000 gallons of toluene at $.50

per gallon, and in turn charged Harrelson at the rate of $.83 per gallon, (plus freight), representing that to be its cost and resulting in Harrelson paying $234,706.33 for toluene and freight. The representation by Ashland that the $.83 per gallon aforementioned represented its costs was false. While the evidence reflects that Harrelson, subsequent to April 1974, could have and indeed, did obtain a portion of its masterbatch from suppliers other than Ashland, by virtue of its commitment to Ashland for the tolling agreement of masterbatch, and because it would have cost more than the masterbatch that Ashland agreed to ship, Harrelson continued to receive masterbatch from Ashland. It was not until the middle of 1975 that Harrelson was able to negotiate another long term contract. In short, plaintiff never intended to, nor did it waive Ashland's breach of contract.

The evidence reflects that as of December 4, 1973, in referring to plaintiff's efforts to purchase masterbatch, Ashland, in an interoffice memorandum characterized such efforts as "black market tactic of offering up to $.30 per pound for 1848 types were without success."

A memorandum from defendant's files dated November 20, 1973, in part, after quoting a representative of plaintiff as having expressed the view that "it was a mistake to place 100% dependance on any given supplier", states, "This is quite evident at present because Harrelson has been out scouting the rubber industry for more products, but has been unable to purchase raw material at any price." As of the date of the breach, and until at least May, 1974, the Court finds that masterbatch was available to Harrelson from sources other than Ashland, only on an extremely limited spot sale basis.

Harrelson's continuation of business with Ashland was premised solely on the fact that Harrelson was unable to secure any other supplier to supply their full requirements of masterbatch until after the contract period had run.

The evidence discloses that in the spring of 1974, masterbatch in extremely limited quantities began to become available to Harrelson from other sources. From January 1974 through August of 1975 Harrelson was able to secure some spot shipments of masterbatch, paying, at least in one instance, $.16 per pound, and ultimately by the middle of 1975 had secured another supplier.

As a direct result of Ashland's breach of contract, and because of no market in masterbatch except as made by Ashland, Harrelson was unable to cover its requirements during the contract year except by purchasing from Ashland and others a total of 25,235,361 pounds (of which Ashland supplied roughly 23 million pounds) at a direct cost to plaintiff of $1,523,176.80 more than the contract prices therefor. Included in this figure is the amount of $995,624.79 in excess of the contract price, paid to Ashland (excluding the "tolling" cost), $157,551.68 in excess of the contract price paid to other suppliers, freight cost of $135,294.00, which, if Ashland had abided by its contractual obligation, Harrelson would not have had to pay, and the sum of $234,706.33 which Harrelson was required to pay in advance under the "tolling" agreement. The latter figure represents the cost for masterbatch ultimately received under that arrangement in excess of what a similar quantity would have cost under the contract. Contra to plaintiff's contention, the Court has deducted all claimed interest charges and has concluded that the appropriate additional cost of the toluene barter, or "tolling" arrangement, was $234,706.33.

In the instant case, it was contemplated by the parties that plaintiff would purchase its requirements from defendant for a one year period. While it was further contemplated that plaintiff would, and was contractually obligated to, purchase a minimum of 50,000,000 pounds of masterbatch during that period, it was never contemplated that the masterbatch was to be resold by plaintiff in its raw state.

Plaintiff's contention that it is entitled to damage for loss of profits it could have obtained by reselling the undelivered masterbatch during the contract period must, in

the Court's view, fail, for it, Harrelson, was not in the business of reselling masterbatch. Not only has the plaintiff failed to sustain the burden imposed upon it to prove, by a preponderance of the evidence, the alleged loss of profits in this regard, but such recovery would have to be premised upon a finding, which the Court cannot under the evidence make, that defendant knew, or should have known, that plaintiff intended to resell its unrequired masterbatch. *See Uniform Commercial Code,* § 2–715. *See also Everett Plywood Corp. v. United States,* 512 F.2d 1082, 1091 (Court of Claims 1975). Plaintiff has failed in its burden in this regard.

The masterbatch purchased by plaintiff during the contract period, including the toluene barter transaction, was, in the Court's view, cover as contemplated by § 2–713 of the Uniform Commercial Code. That purchased after the contract period was not. Indeed, as the Court has already pointed out, defendant in fiscal 1974 produced more tread rubber than it sold.

As the United States Court of Appeals for the Fourth Circuit stated in *Ralston Purina Co. v. McFarlane,* 550 F.2d 967 (4th Cir. 1977), in applying § 2–713 of the Uniform Commercial Code:

> With respect to "cover", the Uniform Commercial Code provides that in the event of a breach a "buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller," (footnote omitted) "in such event he may recover as damages the difference between the cost of the cover and the contract price."

The general rule is that a buyer would be put to a choice as of the time of the breach. In the instant case, as the Court has heretofore pointed out, plaintiff made constant, reasonable and diligent efforts to "cover" from the time of the breach until the expiration of the contract period, its requirements of masterbatch to which it was entitled. Indeed, the Court finds that plaintiff chose to, and did, during the contract year,

cover to the extent of its requirements as it was entitled to under the law. Further, as the Court has heretofore pointed out, with rare exception, the only opportunity that plaintiff had to "cover" was by purchasing from defendant, who controlled both the amount and grade of goods it would supply plaintiff, as well as the price therefor. To hold, as defendant urges, that plaintiff was required to either immediately "cover" the minimum of 50,000,000 pounds or to accept as a measure of damage "the difference between the market price at the time when buyer learned of the breach and the contract price together with any incidental and consequential damages," would be to put the choice in the hands of the defaulter. Indeed, immediate cover of 50,000,000 pounds was impossible. Additionally, to view plaintiff's purchasing conduct during the term of the contract to be anything but "cover" would be to ignore the practicalities of the situation existing as of the time of the breach.

Additionally, plaintiff effected its obligation to mitigate its damages. There being no effective market in which to purchase its contemplated requirements of masterbatch as of November 1973, a choice by it not to "cover", at least to the extent it could, would have resulted in a cessation of its business, and pursuant to N.C.G.S. 25–2–712, entitlement to additional consequential damages; which would have substantially increased its loss.

■ Section 2–713 of the Uniform Commercial Code, N.C.G.S. § 25–2–713, in pertinent part, provides:

> (1) Subject to the provisions of this Article with respect to proof of market price (§ 2–723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (§ 2–715), but less expenses saved in consequence of the seller's breach.

It is perfectly clear from the evidence adduced, that the proximate practical result

of the default by Ashland was to compel the plaintiff, during the contract year, to purchase its masterbatch needs, not only from Ashland, but other sources as well, at higher than the contract prices. The Court is of the view that what the plaintiff, during the contract period, reasonably had to pay for such masterbatch in excess of what it would have paid if the contract had been performed, constitutes its loss in this regard. The appropriate rule of law is that the measure of damages for the breach by the seller, of a contract for the sale of goods, if said goods were found to have been unprocurable by the buyer on the market at the agreed time and place of delivery, is the difference between the contract price and what it cost the buyer in the exercise of reasonable diligence to procure the goods contracted for. *See Apex Mining Co. v. Chicago Copper and Chemical Co.,* 306 F.2d 725, 730 (8th Cir. 1962). In *Apex, supra,* the Court quotes Mr. Justice Holmes as having stated in *Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 543–544, 23 S.Ct. 754, 755–6, 47 L.Ed. 1171 (1903) as follows:

> \* \* \* \* \* \*
>
> When a man makes a contract, he incurs, by force of the law, the liability to damages, unless a certain promised event comes to pass.
>
> \* \* \* \* \* \*
>
> If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach. We have to consider, therefore, what the plaintiff would have been entitled to recover in that case, and that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.
>
> \* \* \* \* \* \*
>
> The consequences must be contemplated at the time of the making of the contract.

In the instant case, the parties contemplated that during a period of one year, plaintiff would purchase from defendant, its requirement of masterbatch, specifying such grades as it deemed appropriate, at the prices called for in the contract.

Indeed, defendant's breach is even the more onerous by its knowledge that it was at the time of the contract plaintiff's only supplier, and its further knowledge that without masterbatch plaintiff was effectively incapable of conducting its business.

N.C.G.S. 25–1–203 reads as follows:

> Obligation of Good Faith.—Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement.

N.C.G.S. 25–2–103(1)(b) states: " 'Good faith' in a case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

N.C.G.S. § 25–1–204(2) states: "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

N.C.G.S. § 25–2–712 states: "(1) After a breach within the preceding section [§ 25–2–711] buyer may 'cover' in making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."

Comment 2 under the aforementioned section provides:

> The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner.

Plaintiff unquestionably acted in good faith and in a reasonable manner.

While Harrelson contends that in addition to the conduct on the part of Ashland heretofore described, Ashland deliberately shipped inferior or wet masterbatch, the evidence does not support a conclusion on the part of the Court that such shipments were anything other than inadvertent. The evidence further discloses, and the Court finds, that as to this aspect of plaintiff's claim, the parties reached an accord by virtue of defendant's agreeing to and in fact

reimbursing plaintiffs for the costs arising therefrom. Section 1–540 of the General Statutes of North Carolina provides:

> *By agreement receipt of less sum is discharge.*—In all claims, or money demands, of whatever kind, and howsoever due, where an agreement is made and accepted for a less amount than that demanded or claimed to be due, in satisfaction thereof, the payment of the less amount according to such agreement in compromise of the whole is a full and complete discharge of the same.

*See also Monroe Construction Co. v. Coan*, 30 N.C.App. 731, 288 S.E.2d 497 (1976); *Moore v. Greene*, 237 N.C. 614, 75 S.E.2d 649 (1953).

■ As to plaintiff's claim for damages because of purchases after the contract period, none will be allowed in light of the Court's conclusion that the contract in issue was a "needs" or requirements contract, and plaintiff's requirements were met during the contract period by its cover. *See* Uniform Commercial Code, § 2–306, N.C. G.S. § 25–2–306.

Plaintiffs claim in addition, other consequential damages for demurrage, increased labor costs, loss of profits, past and future, as well as the excess cost of masterbatch purchased after the contract period.

These increments of Harrelson's claim constitute, as did the freight charges to which the Court has already made reference, alleged incidental or consequential damages and are governed by N.C.G.S. § 25–2–715. Professors White and Sommers define incidental damages as those that are "causally related to the breach." F. White and R. Sommers, *Uniform Commercial Code 312* (1972).

*Demurrage* :

■ Harrelson claims the sum of $18,-620.00 allegedly caused by "Ashland's failure to coordinate shipments by rail." The Court finds that plaintiff has not sustained its burden of proof as to this aspect of its claim, hence, no recovery therefor will be allowed.

*Increased Labor Cost* :

Plaintiff's claim for alleged increased labor costs related to its contention, heretofore referred to, that Ashland had made shipment of wet masterbatch during the contract period. For the reasons heretofore stated, recovery in this regard is barred by the parties' prior accord and satisfaction.

*Loss of Profits, Past and Future* :

■ The lost profits claims by Harrelson likewise fall under the ambit of incidental or consequential damages, and therefore are covered by N.C.G.S. § 25–2–715(2)(a). Ever since *Hadley v. Baxendale*, 156 Eng. Rep. 145 (Exch.1854), the issue of consequential damages has stymied the courts and stimulated the commentators. Here, however, the question may be resolved with some facility, for, the Court is of the view, as to this aspect of its claim, that while plaintiff undoubtedly suffered a monetary loss, it has failed to prove same with sufficient certainty and specificity to permit recovery of either past or future lost profits. The burden, of course, was on the plaintiff to prove all damages resulting from Ashland's breach. Indeed, as the Court has previously made reference, Harrelson produced more pounds of tread rubber in fiscal 1974 than it actually sold. While the evidence does disclose plaintiff had a third production line added in November 1972, although not operational until October, 1973, maximum production could not have been realized from this production line until 1975. The evidence further discloses that in late 1973 and early 1974, a number of principal raw materials, other than masterbatch, needed to produce tread rubber, including oil, resins, tacifers, and curatives, were in short supply. Additionally, Harrelson's claim in this regard would require a finding by the Court as a fact, that Harrelson would have achieved a specific incremental profit margin per pound, and this, the Court is unable to do. In short, Harrelson's claim as to this aspect requires assumptions which the Court is not able from the evidence to fairly make. The Court was not furnished with sufficient evidence as to the labor cost, factory overhead ex-

pense, etc., upon which to base a finding as to lost profits, past or future, which would warrant a specific finding in this regard, and no award for this portion of plaintiff's claim will be allowed.

*Interest*:

In light of the fact that interest on the judgment to follow will be allowed, the Court deems it inappropriate to grant plaintiff's prayer for specific interest losses allegedly caused by defendant's imposition of payment terms less favorable than specified in the contract.

*Unfair Competition—Tortious Conduct*:

■ Harrelson's claim under Chapter 75 of the North Carolina General Statutes, N.C.G.S. § 75–1.1, *et seq.*, is barred by the one year statute of limitations, N.C.G.S. § 1–54(2). *See Thomas v. Petro Wash, Inc.*, 429 F.Supp. 808 (M.D.N.C.1977).

Harrelson, upon whom the burden rests, has failed to satisfy the Court by a preponderance of the evidence that there was a fraudulent concealment on the part of Ashland, or that its failure to discover the facts upon which it premises this claim can be attributed to wrongful concealment on the part of Ashland Chemical. At the very most, Harrelson has simply shown silence on the part of Ashland. Silence or passive conduct on the part of a defendant is not to be equated with fraudulent concealment in light of the fact that the relationship of the parties imposed no duty on Ashland to make disclosures to Harrelson. Ashland's oral and documentary falsehoods, while contra to the observance of reasonable commercial standards of fair dealing, were not of the nature of concealment giving rise to a tolling of the Statute of Limitations. *See Charlotte Telecasters, Inc. v. Jefferson Pilot Corp.*, 546 F.2d 570, 574 (4th Cir. 1976); *Weinberger v. Retail Credit Co.*, 498 F.2d 552, 555 (4th Cir. 1974).

The situation, however, is different as to Harrelson's claim of common law tort.

■ Under the law as stated by the North Carolina Supreme Court, the test of unfair competition is described as follows:

Today the law of unfair competition is plastic. The test is simple, and lies in the answer to the question: Has the plaintiff's legitimate business been damaged through acts of the defendant which a court of equity would consider unfair? *See Carolina Aniline and Extract Company v. Ray*, 221 N.C. 269, 273, 20 S.E.2d 59, 61 (1942). *See also Charcoal Steak House of Charlotte v. Staley*, 263 N.C. 199, 203–04, 139 S.E.2d 185, 189 (1966).

The Court is satisfied by a preponderance of the evidence that Ashland did unfairly interfere with Harrelson's contractual relations with third parties. *See Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E.2d 282 (1976); and in addition, as the Court has heretofore made reference, Ashland's employees acting within the scope of their employment disparaged Harrelson products. *See Carolina Aniline and Extract Co. v. Ray*, 221 N.C. 269, 20 S.E.2d 59 (1942). The statute of limitations applicable to Ashland's liability in this regard is North Carolina General Statute § 1–52(5), which sets a statutory limitation period of three years. It follows therefore that plaintiff's claim as to this aspect of the case has been timely made.

■ The Court views the conduct of the defendant, both in its deliberate breach of the contract, and its conduct thereafter, to have been willful, malicious, reckless and unfair; findings which warrant punitive damages under the law of North Carolina; *see Newton v. Standard Fire Insurance Co.*, 291 N.C. 105, 229 S.E.2d 297, 301, 302 (1976).

The Court is satisfied by more than a preponderance of the evidence that the defendant unfairly dealt with the plaintiff. As the North Carolina Supreme Court stated in *Carolina Aniline Extract Co., Inc. v. Ray*, 221 N.C. 269, 20 S.E.2d 59, at 61, 62 (1942),

It is often very difficult to draw a distinction between fair and unfair competition. 'No inflexible rule can be laid down as to what conduct will constitute unfair competition. Each case is, in a measure, a law unto itself. Unfair competition is a question of fact.

\* \* \* \* \* \*

The universal test question is whether the public is likely to be deceived.' 63 C.J. p. 414, § 112.

\* \* \* \* \* \*

Unfair competition is not confined to the palming off by one competitor of his goods as the goods of another. The same wrongful result may be brought about by other means or practices. *Citing International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293; *Vogue Co. v. Thompson Hudson Co.,* 300 F. 509 (6th Cir.) 'Unfair competition in trade is not confined to the imitation of a trademark, but takes as many forms as the ingenuity of man can devise.'

In *Liberty/UA, Inc. v. Eastern Tape Corp., et al.,* 11 N.C.App. 20, 180 S.E.2d 414, 415 (1971), the Court of Appeals of North Carolina described the test of unlawful competition as lying in the answer to the question: "Has the plaintiff's legitimate business been damaged through acts of the defendants which a court of equity would consider unfair?" This test suggests that actual damage must be shown to sustain the cause of action. While the Court, separating the tortious conduct of the defendant from its deliberate breach of the contract, cannot quantify the damages suffered by plaintiff, by virtue of Ashland's conduct subsequent to the breach, there can be no doubt but that defendant's conduct damaged plaintiff in its dealings with its customers. Indeed, the business of certain customers was, at least for a time, lost to plaintiff because of Ashland's tortious conduct, and plaintiff is entitled solely in this regard to, at the very least, nominal damages.

■ As a rule you cannot have a cause of action for punitive damages by itself. Yet, it cannot be argued but that defendant's breach and subsequent conduct was founded on fraud and deceit and sounds in tort as well as in contract. *See Oestreicher v. American National Stores, Inc.,* 290 N.C. 118, 225 S.E.2d 797 (1976). Additionally, Ashland's deliberate breach gave rise to the compensatory damages heretofore addressed.

Whether one views the defendant's conduct as common law unfair competition, under the law of North Carolina, or as constituting a breach of contract, its conduct was so intentional and deliberate as to leave the Court with a feeling of outrage, warranting punitive damages.

In the instant case, defendant Ashland was fully aware of its obligation under its contract with plaintiff, and was fully aware that it was for all practical purposes, plaintiff's sole supplier. Apparently not satisfied with its punitive action in breaching its contract with plaintiff, as the Court has heretofore pointed out, Ashland deliberately endeavored to, and did interfere with plaintiff's dealings with its customers. *See Smith v. Ford Motor Co.,* 289 N.C. 71, 221 S.E.2d 282 (1976).

Whether its purpose was to assist its subsidiary O.K. Tire and Rubber Co., or to force plaintiff into a financial position wherein it would be vulnerable to a purchase by Ashland or its subsidiary, is of no consequence. Its actions were gross to the point of embarrassment and outrage if they represent a standard for the conducting of business in this country, which it is to be hoped, they do not. The Court is satisfied that defendant's breach of contract, and its conduct following same, constitute a tort for which punitive damages should be assessed.

> Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in a tort action "punitive" or "exemplary" damages, or what is sometimes called "smart money." Such damages are given to the plaintiff over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example. *See United States of America v. Frank W. Snepp, III,* 595 F.2d 926 (4th Cir. 1979).

The Court will therefore award plaintiff nominal compensatory damages for defendant's tortious conduct following the breach in the amount of $10.00, and punitive damages in the amount of $250,000.00.

*Section 2(a), The Robinson-Patman Act*:

 The Court is of the view that the plaintiff has not sustained its burden in reference to its claim premised on the Robinson-Patman Act. In order to so do, Harrelson had the burden to prove that Ashland's conduct resulted in a substantial lessening of competition or the creation of a monopoly in the line of commerce in which Harrelson functionally and geographically competed, or, that the reasonable and probable result of any price difference between that charged Harrelson and a competitor, was the injury, destruction or prevention of competition by Harrelson with the alleged favorite purchaser; and further that any such discrimination in fact injured Harrelson in its business or property. Additionally, O.K. Tire and Rubber Company, which was the primary beneficiary of the price difference heretofore referred to, was not an independent purchaser within the meaning of the Robinson-Patman Act. *See Brown v. Hansen Publications Inc.*, 556 F.2d 969 (9th Cir. 1977); *Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110 (E.D.N.Y.1976).

*SUMMARY*:

Judgment will be entered for plaintiff on defendant's counterclaim.

Plaintiff will be awarded judgment in the amount of $1,523,176.80 with interest at 6% from August 1, 1974 until paid, as well as the nominal sum of $10.00 as compensation for defendant's tortious conduct, and $250,-000.00 exemplary damages. Interest on the recovery for defendant's tort will run from the date of judgment.

An appropriate order shall issue.